[No. 23858. Department Two. July 16, 1932.]

THE STATE OF WASHINGTON, *Respondent*, v. CLARENCE MILES *et al., Appellants.*[1]

*Henry Clay Agnew* and *J. E. Bakken,* for appellants.

*Chas. W. Greenough* and *Frank Funkhouser,* for respondent.

MILLARD, J.—This appeal from judgment and sentence, pronounced on verdict of guilty as to each defendant on both counts, is prosecuted by three defendants who were jointly tried on an information charging them with the crime of second degree burglary and

[1] Reported in 13 P. (2d) 48.

the crime of robbery of the custodian of the subject-matter of the burglary.

It is first contended that, having made the showing required by the statute (Rem. Comp. Stat., § 2135), the trial court erred in overruling the appellants' motion for a continuance.

"A continuance may be granted in any case on the ground of the absence of evidence, on the motion of the defendant, supported by affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it, and also the name and place of residence of the witness or witnesses, and the substance of the evidence expected to be obtained; and if the prosecuting attorney admit that such evidence would be given, and that it be considered as actually given on the trial, or offered and overruled as improper, the continuance shall not be granted." Rem. Comp. Stat., § 2135.

When the cause was called for trial, counsel for appellants moved for a continuance on the ground of the absence in Seattle of a witness, the wife of appellant Miles, alias Arnston, alias Morgan. That motion was supported by the affidavit of the absent witness and by the affidavit of her attending physician.

Mrs. Miles averred that she was the wife of appellant Miles; that she was "at present confined in bed, unable to appear as a witness in this cause;" that she was present at Liberty lake in Spokane county with her husband on the date it is claimed that he committed the crime of burglary and robbery,

". . . and I know that on the evening of said date, after the end of the party at the house next door, all three of the above-named defendants came home and my husband did not leave the house at Liberty lake during the entire evening; that my husband was home with me and slept there the evening in question."

The other affidavit is to the effect that one Norma Miles is under the care of the affiant, a licensed physician of this state, and is suffering

". . . from acute salpingitis with possible infection and that it would be dangerous to her life to go to Spokane or to appear in court as a witness; that this condition will continue for a period of at least two weeks, but that said patient will probably be able to appear and take the trip within thirty days."

The granting or refusing of a continuance because of the absence of a witness, rests largely in the discretion of the trial court. Except for manifest abuse of that discretion—the abuse must clearly appear—the ruling of the trial court will not be disturbed. *State v. Schmidt,* 141 Wash. 660, 252 Pac. 118.

Affidavits controverting those of the appellants were not submitted. There was no offer by the prosecuting attorney to "admit that such evidence would be given, and that it be considered as given on the trial." The testimony of the absent witness to establish an alibi for her husband and the other appellants was competent and material, and would not have been merely cumulative.

Mrs. Miles and the three appellants were the only persons in a position to testify that the three appellants remained all night September 12, 1931, in the house at Liberty lake. She was the only witness who could corroborate the testimony of the appellants as to their whereabouts when the crimes were committed. From the affidavits, it would appear that the testimony of Mrs. Miles could be given at a future trial. Was due diligence exercised to secure the attendance of the absent witness? It does not appear that she was subpoenaed; however, it may be assumed that, as a devoted wife, she would voluntarily appear, if well, and testify in behalf of her husband and his confederates.

The trial court was doubtless convinced, as are we, that the application was not made in good faith, but was made for the purposes of delay, hence it was not an abuse of discretion to deny the application. It appears elsewhere in the record that appellant husband was corresponding with his wife, the absent witness, yet did not know until the date of the trial that his wife was unable to be present because of illness. Surely, he would have known, if it were a fact, that his wife was then seriously ill and had been ill for an appreciable period of time. She was his companion. She was his wife. She was his witness. When was she stricken? Apparently on the eve of the trial. What was the nature of her illness? We are informed by Dorland's Medical Dictionary, 14th edition, that salpingitis is "Inflammation of an oviduct or of the eustachian tube."

Was there a probability that Mrs. Miles' testimony would have changed the result? If not, that alone would warrant the denial of the application for a continuance. From the facts later appearing in this opinion, it is manifest there was no probability that the testimony of the absent witness would have changed the result.

It is next contended that the evidence is insufficient to sustain the verdict as to appellants Murray and Downs.

A few minutes before two a. m. Sunday, September 13, 1931, the Blumauer-Frank Drug Company's store (a six-story building across the alley from the Reliance hotel) in Spokane was burglarized by three men. From the window of room 82 of the hotel mentioned, a plank had been extended to a window of the drug company building. That window was "jimmied," and access to the building thereby gained.

The drug company's watchman testified that, while

on the ground floor of his building, he heard a noise above him. Arriving at the second floor on his tour of investigation, he was confronted, as he stepped from the elevator, by three masked men who were armed. In reply to their query as to when he was supposed to make his rounds and "ring in," the watchman informed the burglars that it was then time for him to make the two o'clock rounds and "ring in" on the A. D. T.; that he was required to "ring in" every hour. Miles

". . . went the rounds with me while I rang in the alarm. . . . He told me not to look at the other two men or at him. He told me not to make any mistake in ringing in or I would be a dead man."

The two o'clock round having been made, Miles and the watchman returned to the point from whence they had departed. The watchman beheld Miles' two companions breaking the safe which contained the valuable drugs. When the burglars had secured narcotics of the value of approximately two thousand dollars, they bound and gagged McBride (the watchman) and departed from the building, leaving behind them a "jimmy" bar with which they had pried open the window on the second floor. At three a. m., the A. D. T. did not receive the required hourly signal. An investigation was immediately made by the police and the crime discovered.

At the trial, the watchman testified positively that Miles was one of the burglars. He testified that he thought Miles' two companions were present in the court room, but when requested to "point them out," he testified:

"Yes, sir, I think they are. Now, I tell you how far I am going with that. Their size corresponds—but that is all I can say, all I am going to say. . . . I couldn't get a look at them, only the size of them, I saw that."

The three appellants arrived in Spokane September 9, 1931. Some time prior to that date, the wife of appellant Miles was arrested in Spokane on a charge of vagrancy. Thinking the trial was set for September 9, 1931, she, Miles and appellant Downs arrived in Spokane that date, having driven from Seattle in Downs' automobile. They were informed the cause would be tried September 15th. Thereupon they, in company with appellant Murray, who had just arrived in Spokane from Butte, Montana, and another woman, rented a cottage at Liberty lake for one week.

Liberty lake is eighteen miles or (in terms of time by automobile) twenty to twenty-five minutes from Spokane. At Liberty lake, the three appellants donned aliases. Miles became Arnston; Downs was known as Rollins; and Murray adopted the name of Murphy. Miles and Downs became acquainted in a Seattle jail, and were thereafter constantly together. Downs' record was a criminal one. He was convicted of burglary in Idaho, Oregon and Washington. Murray, who usually traveled under the name of McLean, admitted he was convicted of crime several times in other jurisdictions. Miles admitted convictions for robbery, burglary and the possession of burglary tools.

About six p. m. September 12, 1931, Miles, who told the landlady his name was Arnston, was shown single housekeeping rooms in a hotel across the alley from the store of the Blumauer-Frank Drug Company. He selected room 82 as the one he would rent the following day. It was from the window of that room that a plank was extended across the alley to a window of the drug company building and access to that building thereby gained. About one a. m. September 13th, 1931, Miles, alias Arnston, was seen by two women in the hallway on the second floor of the hotel. He was then going to room 82.

Mrs. Miles and the three appellants attended a party the evening of September 12, 1931, given by the tenant of a cottage adjoining that of appellants at Liberty lake. The party covered the period of from eight p. m. to about midnight. Appellant Downs was not at the party all evening. About midnight, he came to the party and said to the other appellants, "All right, let's go." Nothing more was seen of the appellants that night. All was thereafter quiet at Liberty lake. About six a. m. September 13, 1931, a guest at the cottage where the party was held the previous evening called at appellants' cottage to borrow an electric iron cord. Appellant Murray appeared at the door fully dressed, except for his coat.

The appellants testified that they were at the party Saturday night, September 12th; that, about midnight, they, after having assisted in the drinking of about three cases of beer, returned to their own cottage. Miles testified that he, in company with his wife, remained from midnight Saturday until the next afternoon in their cottage; that the other two appellants went out that night. Downs and Murray testified that they, with a woman (who was so intimate with Downs that they both used the same surname at Liberty lake), took Downs' automobile after the party, and drove to a road house on the road to Coeur d'Alene from Spokane; that they returned to their cottage at Liberty lake between four-thirty and five o'clock Sunday morning, September 13th. That woman was not called by the appellants as a witness.

On September 15th, 1931, the three appellants drove into Spokane to attend the trial of Mrs. Miles on the charge of vagrancy. The three were arrested as they stopped their automobile in front of the court house. In the automobile were found two hack saw blades, a file on which were iron filings, a flashlight and other

articles, none of which could be classified as strictly burglar tools. When arrested, Downs told the police he had just arrived in Spokane. The flashlight was identified by the drug company's night watchman as resembling the one Miles had at the time of the burglary.

The "jimmy" bar used by the burglars in gaining entrance to the building was admitted in evidence. The pry portion of that bar had been filed thin. It was evident that the bar had been filed down recently. There was also introduced in evidence a bar of the same kind and size to show that, when new, the point or pry portion is blunt. The file found in the automobile and the iron filings thereon were offered in evidence as tending to prove that the appellants filed down the bar used in opening the window of the building burglarized.

Are there any facts which legitimately tend to connect appellants Murray and Downs with the burglary and robbery?

The facts recited abundantly support the verdict as to Miles—it is not contended that the evidence is not ample to sustain the verdict as to him—who was identified by the night watchman. He was also identified as the man who sought to rent room 82 of the hotel. It was from that room the plank was extended across the alley to the drug company building and entrance thereby effected. Miles was seen at room 82 about one a. m., or less than an hour prior to the burglary, which consumed not more than thirty minutes. If Miles departed from the Liberty lake cottage about midnight— he so testified—he had ample time to arrive at room 82 of the hotel about one a. m.

On September 9th, 1931, the appellants took up their residence in the same cottage. They ate together. They slept in the same cottage. They were in each other's company constantly from that date until Sep-

tember 15th, 1931, when the three in the same automobile were arrested. The trade, profession or calling of each of the three was that of burglary and robbery. Of course, that is not proof of their commission of the crimes from conviction of the commission of which they are now appealing. However, the close association or connection of Murray and Downs with Miles (as to whose guilt there is no question) is a circumstance tending to show that the three were acting together. There was sufficient evidence to warrant the verdict of guilty as to all of the appellants.

"It is seldom that burglary can be proved by the direct and positive evidence of witnesses who have knowledge of the actual breaking and entry. The inference of guilt in most instances has necessarily to be drawn from other facts satisfactorily proved. The sufficiency of the evidence in any case belongs exclusively to the jury; the competency of the evidence is to be determined by the court. By satisfactory evidence, which is sometimes called sufficient evidence, is intended that amount of proof which ordinarily satisfies an unprejudiced mind beyond reasonable doubt. The circumstances which will amount to this degree of proof can never be previously defined; the only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of a common man, and so to convince him, that he would venture to act upon that conviction in matters of the highest concern and importance to his own interests." 4 R. C. L. 442.

Appellants next insist that the court should have granted the motion for a new trial, upon the ground that the jury had been permitted to receive improper evidence in the jury room.

There was no objection by appellants to the introduction in evidence of the "jimmy" bar found in the burglarized building and a "jimmy" bar purchased by the state for comparison with the one used by the burglars. Attached to the first bar was a tag on which

was written, "Found in the toilet of Blaumer & Franks where entrance was gained by watchman of the building September 17-31. (Signed) Martin." Attached to the bar purchased by the state was a tag upon which was written, "10453 Jimmy bought from Kilmer & Son for comparison with jimmy used by Jimmy Arntson in burglary of drug store."

The assignment is without merit. The jury understood that the tags were not admitted as substantive evidence, but as marks of identification merely. The appellants could not have been prejudiced. Nothing was stated on the identification tags other than what the witness stated as facts when identifying the two bars. *State v. Cole*, 158 Wash. 29, 290 Pac. 329.

A careful examination of the record not disclosing reversible error, the judgment should be, and it is, affirmed.

TOLMAN, C. J., MAIN, BEALS, and HOLCOMB, JJ., concur.