[No. 31542. *En Banc.* May 10, 1951.]

THE STATE OF WASHINGTON, *Respondent* v. TURMAN G. WILSON et al., *Appellants.*[1]

[1]Reported in 231 P. (2d) 288.

■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■
■■■■

*Sanford Clement* (*Irvin Goodman* and *Leo Levenson,* of counsel), for appellants.

*R. DeWitt Jones, Donald C. Blair,* and *Raymond C. Sly,* for respondent.

HILL, J.—Turman G. Wilson and Utah E. Wilson were convicted of kidnaping in the first degree and murder in the first degree, with a recommendation by the jury that the death penalty be inflicted upon each of them for each offense. From the judgments of conviction and sentences of death, this appeal is taken.

The evidence-in-chief by the state, briefly summarized, is that Jo Ann Dewey was in the bus depot at Portland, Oregon, at about 10:25 p. m. Sunday, March 19, 1950, and had purchased a ticket to go to Vancouver, Clark county, Washington. She later telephoned her mother from the bus depot in Vancouver concerning a ride to her home, and was told to go to St. Joseph's Hospital and come home with a neighbor who was employed there. Between 11:30 and midnight, a woman's screams were heard by nurses in the hospital and by residents in a nearby apartment house. Witnesses attracted by the screams told of seeing a woman beaten and placed in a dark, trunk-type sedan which was driven away before the two men involved could be identified except generally as to size and build.

The police were immediately notified of the occurrence, and one of the officers sent to investigate found, in the street near where the sedan had been standing, a beer bottle of the type called a "stubby." That it had been opened quite recently was evidenced by the fact that the remaining beer "was fresh enough so it had bubbled up" and the officer "noticed large bubbles in the bottle." Utah Wilson's fingerprints were found on this bottle.

Also found on the ground in proximity to the place where the sedan had been, were the handle of Jo Ann Dewey's purse and a barrette belonging to her.

Jo Ann Dewey never reached the hospital. It was not until Sunday, March 26th, that her nude body was found in the Wind river, in Skamania county, some fifty-five miles easterly from the scene of the kidnaping. Her death was caused by carbon monoxide poisoning. Prior to her death, which a doctor testified must have occurred within an hour or two of the kidnaping, she had been brutally beaten about the head and face, her teeth had been fractured and knocked loose, and she had been cut behind her right ear. While unconscious or immediately after her death, she had been sexually violated.

Turman and Utah Wilson were driving a dark, trunk-type Buick sedan on Sunday, March 19th. They left Silverton, Oregon, some sixty miles from Vancouver, at dusk that day; and it was about 6:45 a. m. Monday, March 20th, when they were seen by their brother Grant Wilson and his wife at their home two miles east of Camas and some sixteen miles east of Vancouver. The state's only witness as to their movements during the intervening period was Grant Wilson, who testified as to their statements to him. Those statements placed them in a theater in Portland, Oregon, at the time of the kidnaping. They told him that they had returned to their mother's home at Green Mountain, some six miles north and west of Camas, at about 3:00 or 3:30 that morning, but, because they saw three cars in the vicinity which they thought belonged to law enforcement agencies, they drove by and continued on to Grant's instead of staying at their mother's as they had intended. Without waking Grant, they parked the Buick and took a Pontiac, and then drove past their mother's again. As the cars were still there, they stayed in a wooded area until morning, and then returned to Grant's at about 6:45 a. m. Their reason for their actions, as given by Grant, was that:

"Turman felt they were looking for him because of his prior experience with the Vancouver and Portland police. They had been just after him all times and he felt that since

the police were there they were after him for something he didn't know what."

Without tracing their movements through the next week (most of the time spent in Oregon), as related by them to Grant, suffice it to say that Turman and Utah left for California late Monday, March 27th, in an Oldsmobile that Turman, using the name of Ted E. Davis, had purchased in Portland March 22nd. When arrested in Sacramento, California, March 30th, the brothers were registered at a motel under fictitious names.

The first assignment of error goes to the question of whether the evidence outlined above was sufficient to take the case to the jury, it being urged that the trial court erred in refusing to grant appellants' motion for a directed verdict of acquittal at the conclusion of the state's case.

■ Although no one positively identified Turman and Utah as the men who had seized Jo Ann Dewey and driven away with her, the men described by witnesses to the assault were about their build and the car seen by the witnesses resembled the Buick sedan which Turman and Utah were driving that night. Utah's fingerprints on the recently opened beer bottle afford an identification that completely disposes of appellants' contention that there was no evidence to show that Utah was in Clark county at the time of the kidnaping. In *Parker v. Rex,* 14 C. L. R. (Austr.) 681, 3 B. R. C. 68, it was said:

" 'A finger print is therefore in reality an unforgeable signature. That is now recognized in a large part of the world, and in some parts has, I think, been recognized for many centuries. It is certainly now generally recognized in England and other parts of the British Dominions. If that is so, there is in this case evidence that the prisoner's signature was found in the place which was broken into, and was found under such circumstances that it could only have been impressed at the time when the crime was committed. It is impossible under those circumstances to say there was no evidence to go to the jury.' " (As quoted in 43 L. R. A. (N. S.) 1207, annotation.)

It was established that Utah and Turman were together at Silverton on the evening of the 19th and when they

arrived at Grant's home on the morning of the 20th, and their story to Grant was that they had been together all of the intervening period; so the jury was justified in concluding that, where Utah was, Turman was also.

The murder charge was predicated on Rem. Rev. Stat., § 2392 [P.P.C. § 117-5], and the information charged that Turman and Utah had,

". . . while engaged in the commission of or attempt to commit the crimes of rape, larceny or robbery, or in the withdrawal from the scene of such crimes or attempted crimes, unlawfully and feloniously . . ."

killed Jo Ann Dewey, which, under the statute, constitutes murder in the first degree. The details of events after the kidnaping until Jo Ann Dewey was killed and her body thrown into the Wind river are unknown, but her clothing and purse have never been found (at least so far as the record discloses), and the inference that she had been robbed, raped, and killed by the same men who had seized her on the streets of Vancouver seems inescapable to us. *State v. Craemer*, 12 Wash. 217, 40 Pac. 944; *State v. Gates*, 28 Wash. 689, 69 Pac. 385; *State v. Whitfield*, 129 Wash. 134, 224 Pac. 559; *State v. Bolen*, 142 Wash. 653, 254 Pac. 445; *State v. Cerciello*, 86 N. J. L. 309, 90 Atl. 1112, 52 L. R. A. (N. S.) 1010; *People v. Jennings*, 252 Ill. 534, 96 N. E. 1077, 43 L. R. A. (N. S.) 1206; *People v. Roach*, 215 N. Y. 592, 109 N. E. 618, Ann. Cas. 1917A, 410; *Garcia v. State*, 26 Ariz. 597, 229 Pac. 103; *State v. Kuhl*, 42 Nev. 185, 175 Pac. 190, 3 A. L. R. 1694.

■ Nor does the fact that no one can say with certainty whether the death occurred in Clark county, where the kidnaping occurred, or in Skamania county, where the body was found, present any bar to the prosecution for murder in Clark county. Our statute, Rem. Rev. Stat., § 2013 [P.P.C. § 141-1], reads as follows:

"When a public offense has been committed partly in one county and partly in another, or the act or effects constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county."

See, also, *State v. Knutsen*, 168 Wash. 633, 12 P. (2d) 923; *State v. Ashe*, 182 Wash. 598, 48 P. (2d) 213; *State v. Moore*, 189 Wash. 680, 66 P. (2d) 836; *State v. Bogart*, 21 Wn. (2d) 765, 153 P. (2d) 507.

In *State v. Ashe, supra*, we approved a trial in King county on an information charging, in one count, an abduction in King county and, in another count, the placing of the abducted girl in a house of prostitution in Pierce county, saying that the essential elements of the crimes charged were all part and parcel of the same transaction.

The trial court did not err in refusing to grant appellants' motion for a directed verdict of acquittal at the conclusion of the state's case.

The second assignment of error is that the same motion should have been granted when repeated after both sides had rested. It becomes necessary, therefore, to consider the evidence offered by the appellants.

The defense was an alibi. Testimony of witnesses other than Turman and Utah placed them in a motion picture theater in Portland as late as 9:00 or 9:30 p. m. Sunday, March 19th. Their own testimony was that they left the theater after midnight and that, due to car trouble, they did not cross the interstate bridge from Oregon to Washington until 1:30 or 2:00 a. m. Monday, March 20th.

They explained that they did not return to their mother's home at Green Mountain, as they had intended, because they saw cars in proximity thereto which they thought were cars used by law enforcement officers, and therefore kept on going until they arrived at Grant's home at about 3:30 a. m. They then decided to drive back past their mother's to see if the cars they had noticed were still there, and for that purpose they took a light-colored Pontiac, leaving the Buick at Grant's. When they drove past their mother's home, two of the cars they had previously noticed were gone. They then went into Vancouver to see whether there was any indication that officers were watching Utah's place of residence in Vancouver. Although they found no evidence of surveillance there, they remained parked in that vicinity for

a couple of hours. (It will be remembered that Grant, as a witness for the state, had testified that they told him that, after going past their mother's home the second time, they remained in a wooded section until daylight.) They then returned to Grant's, left the Pontiac, and again took the Buick. They had gone a short distance in the Buick when it occurred to them that they should let Grant know that they had used the Pontiac. They then returned and talked to Grant; and it was at this time, fixed by Grant at about 6:45 a. m. Monday, March 20th, that we have the first testimony other than their own as to their activities since 9:30 the previous night.

Included in appellants' case was a detailed tracing of their movements from Monday morning, March 20th, at 6:45, until their arrest in Sacramento, California, March 30th, marked by their affirmative replies to an oft-repeated leading question as to whether they were in fear when they did certain things. Without going into detail, we will outline so much of the happenings of that ten-day period as is necessary to make intelligible some of the references to dates, places, and cars when we come to the third assignment of error.

On Monday, March 20th, Grant saw Turman and Utah at his home at 6:45 a. m. He met them at noon near Lacamas lake and again that evening in the same place. Turman and Utah went with Grant to their mother's home at 6:30 or 7:00 p. m. (they did not thereafter use the Buick but used the Pontiac until it was abandoned in Portland); then went with Grant from their mother's home to the Cline home in Vancouver; and then returned with him to their mother's. From there Turman and Utah, the latter accompanied by his wife, left for Portland, arriving at about 10:00 p. m. Thereafter until they left for California on Monday, March 27th, they spent most of their time in Oregon, returning to Clark county for short periods on three or four occasions.

After spending all day Tuesday, March 21st, and most of Wednesday, March 22nd, in Portland, they rented a U-Drive car and went to Clark county, where they saw Grant and

their mother. Grant returned to Portland with them. That evening Turman bought a used Oldsmobile in Portland, after which they returned the rented car and Grant took the Pontiac from the parking lot and parked it on a nearby street. (They did not thereafter use the Pontiac.) Using the Oldsmobile, they took Grant back to their mother's. From there, Turman and Utah left for Medford, Oregon, at about 1:30 Thursday morning, March 23rd. They arrived in Medford that afternoon and returned to Portland Friday afternoon, March 24th; went to Grant's later that evening for a short time; and then returned to Portland. On Saturday, March 25th, they were in Portland, although Grant testified that he saw them for about fifteen minutes at the Camas port dock that day.

Sunday, March 26th (the day Jo Ann Dewey's body was discovered), was also spent in Portland. That night they changed the parking place of the Pontiac. Monday, March 27th, in the evening, they went to the Cline home in Vancouver and then to their mother's. They left her home for California about 11:00 p. m. that night and arrived in Sacramento Wednesday morning, March 29th. That afternoon Turman telephoned Grant. They were arrested in Sacramento about 7:00 p. m. March 30th.

■ It is apparent that the appellants' evidence, apart from the "window dressing," presented to the jury a question of fact, *i.e.*: Were the appellants in a theater in Portland, Oregon, at the time the state's evidence indicated they were kidnaping Jo Ann Dewey in Vancouver, Washington? It was the function of the jury to determine that factual question, and the trial court did not err in denying appellants' motion for a directed verdict after both sides had rested. *People v. Roach,* 215 N. Y. 592, 109 N. E. 618, Ann. Cas. 1917A, 410; *Duree v. United States,* 297 Fed. 70.

The third assignment of error raises what seems to us the most serious question on this appeal, *i.e.*: Did the trial court err in refusing to admit certain testimony offered for the purpose of explaining appellants' reasons for avoiding law enforcement officers and for their apparent flight?

■ The state having introduced evidence of flight, the appellants were entitled to explain why they fled, in order to answer any inference of guilt that might arise therefrom. *State v. Moser,* 37 Wn. (2d) 911, 226 P. (2d) 867; 20 Am. Jur. 275, Evidence, § 296.

Their explanation of their flight and other suspicious conduct was that Utah was under suspicion of having stolen a power saw and they feared that if he was arrested for that offense his probation would be revoked and he would be sent to prison for certain robberies. (He had entered a plea of guilty to those robberies, and sentence had been deferred and he had been placed on probation for two years.) It was their purpose and intention to avoid arrest until April 10th, at which time Utah was scheduled to see his probation officer, and they believed they could convince that officer that Utah had had nothing to do with the theft of the power saw.

It was the state's position that, until it was shown that a power saw had been stolen and that there was some reason for Utah and Turman to fear that Utah might be arrested on such a charge, the evidence designed to establish their fears on that score as a reason for their flight was not admissible. Supporting that position, the state cited *Kennedy v. Commonwealth,* 77 Ky. (14 Bush) 340. That case is criticized by Dean Wigmore, as is any limitation of explanations that may be offered for flight. He says that

". . . the general and sounder tendency is to admit them [explanations of flight] freely, leaving to the jury to pass upon their plausibility." 2 Wigmore on Evidence (3d ed.) 118, § 276.

■ The better rule is that approved by Wigmore, *i.e.,* that whether or not there actually exists any reason for the fear that induces flight, a defendant should have the right to explain the reason for his fear and his flight. That the explanation is fantastic, as the state here contends, is beside the point; the reasonableness of the defendant's explanation is for the jury in determining the weight to be attached to the circumstances of his flight. *Goforth v. State,* 183 Ala. 66, 63 So. 8; *McAllister v. State,* 30 Ala. App. 366, 6 So. (2d)

32; *People v. Jackson,* 88 Cal. App. (2d) 747, 199 P. (2d) 322; *State v. Rowe,* 203 Minn. 172, 280 N. W. 646; *Weeks v. State,* 66 Ga. App. 553, 18 S. E. (2d) 503; 1 Wharton on Criminal Evidence (11th ed.) 407, § 301; Underhill on Criminal Evidence (4th ed.) 477, § 254.

A case of particular interest because of the similarity of the explanation offered by the defendant to that advanced in the present case, is *Hines v. Commonwealth,* 136 Va. 728, 117 S. E. 843, 35 A. L. R. 431. There the defendant sought to explain why he had not surrendered himself on a murder charge, by showing that he had been persuaded to defer surrendering until the judge of the trial court, who was out of the city, could be consulted. The trial court refused to receive that explanation, and the appellate court held that it should have been admitted.

With this background, we now come to a consideration of the four specific instances in which appellants say that evidence relating to their explanation of flight was erroneously excluded.

1. Mrs. Eunice Wilson, mother of Utah and Turman, was not permitted to testify that on

" . . . Saturday, March 18, 1950, she heard her sons Turman and Utah state that they intended to go to Silverton, Oregon, on Sunday, March 19th, 1950, to visit their father; that on Monday, March 20, 1950, she had a conversation with her sons wherein they told her that they were advised that a power saw had been stolen and that they were concerned about Utah's parole being revoked. That on Monday night, March 20, 1950, at 8:30 P.M. in the evening she was present with her sons, Turman and Utah, when they stated in effect that they thought they would go to Portland for a few days; that the trip would be in the nature of a honeymoon for Utah and that if they stayed away for a few days the power saw matter might be cleared up and Utah's parole would not be violated because Utah had nothing to do with the theft of the power saw. That on or about Wednesday night, March 22, 1950, the witness had another conversation with her sons, Turman and Utah, and the general subject of that conversation was the alleged theft of a power saw, the danger of Utah's parole violation and Turman's concern over Utah's parole, and its possible violation.

That on March 27, 1950, the witness had another conversation with Turman and Utah Wilson and on this occasion Turman told the witness . . . that he and Utah planned to go to California on account of the power saw situation and because the police were looking for Utah, and that Turman concluded this conversation by advising his mother that he and Utah would be back by the time Utah was to report to his Parole Officer, and that the alleged theft of the saw would then be cleared up and Utah exonerated of the charge."

2. Carl Whitney was not permitted to testify

" . . . that he is on parole and is a friend of Utah Wilson, who he knows is also on parole; that the witness Carl Whitney heard a power saw had been stolen and came to the home of Mrs. Gladys Cline in Vancouver, Washington, who is the mother-in-law of Utah Wilson; that he came to the home for the purpose of asking Utah whether Utah knew anything about the theft of the power saw . . . that he felt Utah's parole would be revoked and he was also concerned about his own parole. He wanted to get the facts about the alleged theft of the power saw and the revocation of his and Utah's parole, since he and Utah were absolutely innocent of the theft of the power saw."

3. Turman Wilson was not permitted to testify that

" . . . on Saturday, March 18, 1950, at the home of Mrs. Gladys Cline and Lucille Cline Wilson, and in the presence of those two parties, his brother Utah Wilson and himself, there was a conversation about the alleged theft of a power saw. Furthermore, that the matter of Utah's probation was mentioned and a general discussion ensued, relative to the possibility of Utah's probation being revoked because he was one of the persons who was under suspicion of having stolen the power saw."

4. Turman was likewise not permitted to testify, in answer to the question, "Why did you move the Pontiac to another location?"

" . . . 'that the Pontiac automobile was left on a Portland street a couple of blocks from Union Avenue rather than in a garage because the witness believed that if the automobile had been stored in a garage the operator of the garage would have reported the car to the police . . . , that some three days later the Pontiac car was moved about

six blocks from the place where it was originally parked on the street, and that the reason for moving the Pontiac car was to avoid suspicion that might arise if the car was left too long in any one place . . ., that it was his plan, likewise that of his brother Utah and his brother Grant, to hide the Pontiac car until the 10th of April, which is the day and which is the date that Utah was to report to his parole officer, and that after the parole officer fully understood that Utah was in no way involved in the theft of the power saw the defendants [appellants] would again take possession of the Pontiac.' "

Only the fourth offer of proof presents the question with which we are here concerned unencumbered by other extraneous and confusing issues relative to hearsay, self-serving statements, order of proof, corroborative or primary evidence, specific purpose for which offered, failure to advise the trial court of specific purpose, etc. While we are disposed to believe that adequate reasons can be found to sustain the trial court's rejection of the first three offers of proof, we will not enter into any detailed discussion thereof because the question sought to be raised is squarely before us on the fourth offer of proof.

The moving of the Pontiac car from place to place in Portland and its abandonment after the acquisition of the Oldsmobile were suspicious circumstances, and, as we have indicated, the appellants were entitled to offer any explanation of flight or suspicious conduct they might care to make. The trial court, sustaining the objection to the fourth offer of proof in the absence of the jury, said:

"Counsel's objection will be sustained and the offer of proof will be denied. Let's not have any more reference to the power saw.

"Gentlemen, so there will be absolutely no misunderstanding about the Court's position with reference to this power saw, to make it clear. It is the Court's ruling that until such time as the offense with reference to the theft of a power saw has been established by competent evidence, evidence that is reliable, admissible; evidence that is not based on hearsay or rumor, or facts are introduced here to prove the commission of an offense of the theft of the power saw, until that time any reference to such an offense will be

excluded. Do I make myself clear? It will also be the ruling of the Court there will be no further reference to this power saw until it is established by legal, admissible evidence."

■ The trial court's ruling on this offer of proof was erroneous. Whether or not a power saw had been stolen was immaterial; the appellants had a right to explain the state of mind that prompted their suspicious conduct.

■ Error, however, must be prejudicial before a new trial will be granted. *State v. Moore,* 35 Wn. (2d) 106, 111, 211 P. (2d) 172, and cases there cited. We are convinced, for two reasons, that this error was not prejudicial: (a) An explanation of appellants' flight and suspicious conduct in connection therewith was before the jury; and (b) if the excluded testimony had been admitted, the verdict would in all probability have been the same.

(a) *Evidence was before the jury as to reasons for flight and other suspicious conduct.*

While not evidence, and the jury was specifically so informed, we feel that we might well preface our consideration of the evidence before the jury on this phase of the case, with the following excerpt from the opening statement by counsel for appellants:

"We believe the evidence will show that on Saturday morning, March 18, 1950, that is the day before this crime was committed, both of these boys were in the Vancouver Dental Clinic and that early in the afternoon, upon returning to Utah's home they were definitely advised that the officers were looking for Utah in connection with the theft of a power saw. The saw was alleged to have been stolen from the place at Larch Mountain where he had worked. This is the day before this crime was committed that they were looking for Utah in connection with this theft of the power saw. The theft was at Larch Mountain where Utah had worked. Now, we believe the evidence will show that after Utah received this information early Saturday afternoon concerning the theft of this power saw he decided to hide out from the officers until he had the opportunity to report to his Probation Officer on April 10th and explain to him that he was innocent of the theft of the power saw. Turman, who knows what the inside of a penitentiary is like, and who did not want Utah to have that experience,

decided to quit his job at the Washougal Woolen Mills and go with his younger brother so he would not be alone. Therefore, we believe the evidence will show, that the hiding out of Turman and Utah began before the crimes charged in the information and solely because Utah was sought for the theft of the power saw and the fear of revocation of his parole."

(Supplementing this excerpt from the opening statement, it should be borne in mind that the jury knew that Turman had been in the Oregon state penitentiary from the time he was sixteen until he was twenty-two, for rape and for a car theft committed during an attempt to escape from the penitentiary. He was released April 16, 1948, and thereafter served some four and a half months in the Multnomah (Oregon) county jail after pleading guilty to petit larceny, being released April 1, 1949. He had, however, worked steadily at the Washougal Woolen Mills from October 3, 1949, up to and including Friday, March 17, 1950.)

Grant Wilson, brother of the appellants, was called as a witness by both the state and the appellants. As a witness for the state he testified to being with his brothers at noon Monday, March 20th, and again that evening he was with them at his mother's home and at the place in Vancouver where Utah was living (the home of his mother-in-law, Mrs. Gladys Cline); and of the departure of Turman and Utah and his wife for Portland in the Pontiac; of their return in a rented Dodge late in the afternoon Wednesday, March 22nd; of his return to Portland with Turman and Utah that evening, when they purchased the Oldsmobile; of moving the Pontiac from one place to another in Portland; and of seeing Turman and Utah Friday night, March 24th, at his home, and Saturday night, March 25th, at the Camas port dock. As part of his testimony, the following questions were asked and answers given:

"Q. Do you recall what that conversation [Saturday night, March 25th] was about? A. It was, the gist of it was, about the saw deal, or about a saw that had been stolen. That conversation had been going on since Monday whenever we met. There would be some conversation about the saw and about Utah's whereabouts. Q. Some conversation

about that on Monday night, March 20th? A. Yes. Q. Where was that? A. That was at the Cline's home when we went to—Utah and Turman and I had went there from Mother's home and we discussed it there."

Grant also testified that Turman called him by long distance telephone from Sacramento in the afternoon of Wednesday, March 29th, in regard to the saw, and wanted to know if any police had been inquiring about Utah and the power saw since March 27th.

Grant talked with law enforcement officers, in the presence of his minister, on Wednesday, March 29th. They convinced him that the police did not want Utah in connection with the theft of a power saw and were not going to interfere with his parole on that account; so Grant felt then that his brothers' fears were groundless and that they had no reason to stay away, and he was willing to urge them to return home. He wanted two days to get his brothers back home. To use his own words:

"They said all they wanted from Turman was when he come in and what his alibi was and there was nothing in the papers about it and they would be cleared up and those were their reasons. And as far as Utah's parole was concerned, they wasn't going to violate Utah's parole. They had reasons to violate it, but they didn't want to cause Utah any trouble as long as he kept his nose clean. That was the three reasons they were away in regard to Utah's parole and Turman's reputation and the power saw. After telling me that, I knew if they didn't want any other reason for running away, other than those three reasons they gave, and those was the reasons I had said about Turman's standing in regard to certain police in Vancouver, and in Portland, they had no reason for staying away and that they would come back. So I told Mr. Borgan and Mr. Ulmer [the officers], in the presence of Reverend Cranston they would give me two days to get them back, get the boys back, providing the case didn't break."

Grant also said, though not specifying the time, that Utah and Turman had discussed with him the matter of returning to talk with Utah's parole officer on April 10th about the saw.

Under cross-examination by appellants' counsel, Grant testified as to what he had told police officers concerning a conversation at Mrs. Cline's Monday evening, March 20th. We quote:

"I explained to them that we went to Cline's and on arriving at Cline's we asked if any police had been there inquiring about Turman and Utah and their whereabouts, and there hadn't been anybody there, and they discussed the matter about a saw that had been stolen. A fellow by the name of Carl Whitney came to Mrs. Cline and told her he was in fear and this somebody was in fear as Carl Whitney thought he was connected with the stealing of a power saw in the Larch Mountain Area, Carl Whitney told Mrs. Cline that this fellow in jail had connected Utah with the stealing of a power saw."

We quote another portion of the cross-examination:

"Q. What was the purpose of hiding out until April 10th? . . . A. April 10th was the day that Mr. O'Brien, I believe, the Parole Officer, came to Vancouver, and that was his itinerary to talk with the fellows that were under him, and Utah, Turman and I had discussed it, that it would be good to talk it over with him. We felt he was a fair man and would do the right thing by Utah. He didn't have any prejudice for Utah or Turman, and we felt if the deal was cleared up about the saw and the rest of the things, they could clear it up with Mr. O'Brien personally. Utah could and would prove he had nothing to do with the stealing of the saw. That was the purpose of coming back home April 10th. They would have done that, but they didn't get a chance to.

"Q. Is it your testimony that Utah planned to explain to the Parole Officer on April 10th about the saw deal? A. Yes. Q. And that he didn't violate his parole, is that what you mean? Is it your testimony that Utah wanted to report to the Parole Officer on April 10th that he had nothing to do with the theft of the power saw? A. Yes."

G. L. Tull, one of the officers who arrested Turman and Utah in Sacramento, testified that Utah had given as a reason for going to California that he had been suspected of stealing a saw at a location where he had been employed. On his cross-examination by counsel for the appellants, we find the following:

"Q. I want to ask a few questions about this power saw conversation. Where were you when Utah told you that he was suspected of having stolen the power saw? A. That was in the office of the Assistant Chief of Police in the Sacramento Police Department. I was sitting in a relative position of the defendant two feet or so, sir. Q. Was this conversation with reference to the power saw on the very day that you interviewed Utah? A. Yes, sir, it was."

James J. Tanner, another of the arresting officers, said that Turman told him that the reason they went to California was their belief that Utah was wanted for a parole violation. This was repeated on cross-examination.

F. W. Borgan, a detective on the Vancouver police force and one of the officers who went to Sacramento to bring Turman and Utah back to Vancouver, testified that Turman told him that the reason he had quit his job and gone to California was that they were afraid that Utah's probation would be revoked "due to some saw," and he (Turman) wanted to look after Utah. On Borgan's cross-examination, we find the following:

"Q. Officer Borgan, you testified on direct examination a few moments ago that Turman told you that he wanted to get Utah to California because they wanted to revoke his probation on account of a power saw. A. I didn't say that. Q. What did you say? A. I said Turman said he was afraid they might revoke it. Q. Turman said he was afraid they might revoke Utah's parole? A. Yes. Q. Because of the theft of a power saw? A. Some saw. I don't know."

During the presentation of the defense case, Grant Wilson was called again, and testified that he parked the Pontiac in Portland at about 9:45 or 10:00 o'clock on the evening of Wednesday, March 22nd, to stall the police in case they decided to look for Utah in connection with the saw, and that it was planned to recover the Pontiac after Utah had seen his parole officer on April 10th and had been "cleared to the saw deal."

On Grant's cross-examination by the state, reference was made to the fact that Turman and Utah had spent several hours before noon Monday, March 20th, in a wooded area near Lacamas lake, and Grant was asked why they were not

at their mother's home. He answered that they figured that the police would be looking for them there "because of the power saw that Utah was supposed to have stolen." However, Grant corrected that statement, saying that he did not hear anything about the power saw when he saw Turman and Utah Monday morning and Monday noon, and that the reason they gave at that time for having remained in the woods was "Just Utah's parole," and that Turman "was looking out for the freedom of Utah and he had experience and he wanted to keep Utah from it if possible."

On direct examination, Turman Wilson was asked why he and Utah used assumed names at Silverton, Oregon, Sunday afternoon, March 19th, and he replied: "Utah's reason was because of his probation and my reason was because I very frequently used assumed names for the past two and a half years."

His explanation of the failure to stop at his mother's home Monday morning, March 20th, was in part as follows:

"About two blocks before we got to mother's house there was cars parked there with the parking lights on and I had never seen a car like that one at that time in the morning and I assumed it might be the police or something to do with the previous week concerning Utah and Utah was driving and we kept on going."

On the state's cross-examination, he testified, further, that the reason they went to Medford was that they intended to find Utah a job. Asked why they went to Grant's on Friday evening, March 24th, after their return from Medford, he replied, "We went to talk the situation over concerning Utah's probation." When asked if he had decided at that time to go to California on Monday, March 27th, he replied: "Until the 10th of April. We intended to come back. The situation was taken up with the whole immediate family." He also explained that one of the purposes of the long distance call from Sacramento on March 29th "was to talk over Utah's probation and what we were doing," and he emphasized that he was concerned solely for Utah's welfare.

Utah Wilson, on direct examination, in response to the question "Why did you go to Medford?" replied:

"We wanted to get me a job so I could—I had asked my Probation Officer, Mr. O'Brien, on different occasions if it would be possible to get an out-of-the-state parole. I was on probation or parole, one way or another, and he told me the only way that would be possible would be to have a job to go out of the state, or out of town, and I figured if I could get a job and come back and tell my Probation Officer and tell him I had a job he would fix it so I could leave Vancouver and get out of the state of Washington."

We also find these questions and answers in Utah's direct examination:

"Q. I don't remember which officer, but did you have a conversation with any of these officers at that time [the time of the arrest in Sacramento] as to the reason why you came to California was that you was in fear of your parole being violated? A. Yes, Officer Tull, the last one you mentioned. Q. And because you wanted to get work? A. Yes."

On cross-examination he was asked about a conversation with Frank A. O'Brien, his probation officer, after his return from Sacramento. We quote:

"Q. Didn't you tell him that it wasn't anything in connection with the probation that caused you to leave Vancouver? A. No, that is the reason I left. Q. What did you tell him? A. The exact words I told him, Mr. O'Brien, when I left Washington I did not think I was breaking my parole just to be leaving but I knew if I was staying or moving out without his permission I would be breaking it. Q. I don't quite follow it. You told him you thought you would be breaking the parole? A. I will make it a little simpler: He knows if I go over to Portland that is over in Oregon, I wouldn't break my parole when I went over to Portland; but if I went to Portland to live I would be breaking my parole."

While we feel that the appellants were unduly restricted on numerous occasions (as to which no assignment of error is made) in their efforts to get their explanations for leaving Clark county and for their conduct in Oregon and California in evidence, it seems to us that the evidence we have set forth, which was before the jury, could not have failed to inform it that the appellants were contending that, because

Utah was suspected of having stolen a power saw, they were in fear that his probation would be terminated, and so planned to avoid all law enforcement officers until April 10th, when he would report to his probation officer; and that Turman had quit his job and traveled with Utah to look after him during that period.

■ We are therefore of the opinion that the error complained of was not prejudicial, because appellants' explanation of the reasons for their flight and the circumstances connected therewith was before the jury. *State v. Wilson,* 68 Wash. 464, 123 Pac. 795; *State v. Miller,* 78 Wash. 268, 138 Pac. 896; *In re Krilich's Estate,* 122 Wash. 306, 210 Pac. 788, 215 Pac. 9; *State v. Coles,* 147 Wash. 166, 265 Pac. 166; *State v. Moore,* 182 Wash. 111, 45 P. (2d) 605; *Sweazey v. Valley Transport,* 6 Wn. (2d) 324, 107 P. (2d) 567, 111 P. (2d) 1010, 140 A. L. R. 1.

(b) *If all the offered testimony had been admitted, the verdict would in all probability have been the same.*

Although some of the evidence of the state and much of the appellants' own case was devoted to tracing their movements from 6:45 a. m. March 20th to their arrest in Sacramento ten days later, it could all have been omitted from the record. The vital question was: Where were Utah and Turman between 9:30 p. m. Sunday, March 19th, and 6:45 a. m. Monday, March 20th? The state's evidence, particularly Utah's fingerprints on the beer bottle, presents one answer, and the uncorroborated testimony of Utah and Turman presents another. The jury believed the mute evidence of Utah's fingerprints and disbelieved Utah and Turman. If it were not for Utah's fingerprints on the beer bottle, we would feel that, if the appellants had not been able to get their explanation of their flight and other suspicious conduct adequately before the jury, the exclusion of the proffered testimony would have been prejudicial error and would have justified a new trial, because, without the fingerprints, the flight and other suspicious conduct would have been of great value in buttressing the state's case. Under the circum-

stances here, the flight is not an important part of the state's case. As was said in *State v. Scott*, 120 Me. 310, 114 Atl. 159:

"Proof made that a crime has actually been committed, flight to avoid arrest may be shown in evidence as a circumstance having tendency to prove consciousness of guilt on the part of him who fled. Flight, however, is but a subsidiary inferential fact, *counting for much or for little in the balances of justice, as the other evidence in the particular case may weigh with it.*" (Italics ours.)

See, also, 2 Wharton's Criminal Evidence (11th ed.) 1652, § 940.

 It seems to us that Utah's fingerprints on the recently opened beer bottle, found within a few minutes of the kidnaping, is the most conclusive evidence of his presence at that time and place that could be offered. That Utah and Turman kidnaped Jo Ann Dewey seems to us unmistakably established. If the kidnaping on March 19th was established, as we believe it was, the inference that the men who committed the kidnaping likewise committed the murder is likewise not subject to a reasonable doubt. We are convinced that, if on a new trial the testimony concerning the reasons for appellants' fear and flight were given as frequently as appellants might desire, the verdict would in all probability remain the same, because all the explanations of flight and other suspicious circumstances cannot wipe out the fingerprints. As Lady MacBeth said: "Here's the smell of blood still; all the perfumes of Arabia will not sweeten this little hand." See, also, *Stacy v. State*, 49 Okla. Crim. 154, 292 Pac. 885, and *Hines v. Commonwealth*, 136 Va. 728, 117 S. E. 843, 35 A. L. R. 431.

 The fourth assignment of error, that the trial court erred in admitting into evidence the beer bottle with Utah's fingerprints on it, is so patently without merit that discussion is unnecessary.

The fifth assignment of error is that the court refused to let Grant Wilson testify

" . . . that after the abduction he saw a party remove bottles from the garbage can at Utah's home. The next day after he saw the bottles removed from Utah's

home, and he saw the same man who removed the bottles near the Sheriff's office at the courthouse in Vancouver, he passed that man and as he did so that man gave the witness, Grant Wilson, a dirty look."

This assignment of error is also patently without merit, as the evidence offered has no visible, reasonable connection with any issue before the jury. It lacks relevancy as defined in *Keisel v. Bredick,* 192 Wash. 665, 669, 74 P. (2d) 473, in that there is no logical relationship between the proposed evidence and any fact to be established. Obviously, any bottle taken from Utah's garbage can after the abduction could not have been found on the street where the "abduction car" was parked the night that the offense was committed. If the proffered testimony was intended to plant the thought in the minds of the jury that the bottle with Utah's fingerprints on it had been taken from his garbage can by an unidentified man and then placed in evidence as being the bottle found at the scene of the kidnaping, we can only say that the testimony offered does not support even a suspicion that such was the case, much less an inference. There is no suggestion that the testimony offered was a link in the chain of evidence.

Chief Justice Pearson of the supreme court of North Carolina aptly expressed the rule as to relevancy in these words:

" 'The rule that evidence which is too remote is inadmissible may thus be stated: that as a condition precedent to the admissibility of evidence, the law requires an *open and visible* connection between the principles [principals] and the evidentiary facts; this does not mean a *necessary* connection which would exclude all presumptive evidence, but such as is *reasonable* and not latent or conjectural.' " *Bottoms v. Kent,* 3 Jones 154, as quoted in *State v. Brantley,* 84 N. C. 766.

As is said in 1 Wharton's Criminal Evidence (11th ed.) 262, § 222, "Irrelevant facts draw the minds of the jurors from the point in issue, and tend to excite prejudice and to mislead."

We see in this offered testimony only a "red herring." The trial court's ruling was correct.

The sixth assignment of error is predicated upon the following situation. Mrs. James Nelson saw from her apartment window the abduction car and the two men involved, but under conditions as to distance and visibility that made impossible any description other than as to size and build. She testified that she went to the county jail in April and was shown two line-ups of six men each, and that from each line-up she selected a man "that I judged came the closest to the outline I saw that night when I looked out the window." She testified further that the men she picked out of the line-ups "had similar appearance" to those she had seen. At the trial she was not asked any questions about the appellants and made no effort to identify them.

The chief of police of Vancouver, Harry Diamond, testified that at the county jail Mrs. Nelson had picked a man from each of the two line-ups. He testified further that the man she selected from one line-up was Utah and the man she selected from the other was Turman. It is urged by appellants that Chief Diamond's testimony was an extrajudicial identification of the accused.

It will be conceded that there is a marked division of authority as to the admissibility of evidence of extrajudicial identification in a trial in which the identity of the accused as the person guilty of a crime is in dispute. We prefer the reasoning of those courts which favor admissibility. The rationale of their decisions is well stated in 4 Wigmore on Evidence (3d ed.) 208, § 1130. Wigmore points out that identification of an accused in the courtroom (judicial identification) is of little testimonial force, as, after all that has intervened, it would seldom happen that the witness would not have come to believe in the accused's identity; and that it is entirely proper to corroborate the witness by proving that at a prior time, when suggestions of others could not have intervened to create a fancied recognition in the mind of the witness, he had recognized and declared the present accused to be the guilty person (an extrajudicial identification). He concludes:

"This is a simple dictate of common sense, and was never doubted in orthodox practice. That some modern Courts

are on record for rejecting such evidence is a telling illustration of the power of a technical rule of thumb to paralyze the judicial nerves of natural reasoning." 4 Wigmore on Evidence (3d ed.) 210, § 1130.

■ It should be noted that this case does not fall within the usual pattern of extrajudicial identification. The testimony of Chief Diamond was not to corroborate that of Mrs. Nelson, who made no positive identification, but to complement it. Taken together, they told the jury that Mrs. Nelson selected the man in each line-up at the jail who most nearly resembled one of the kidnapers in physical appearance, and that the men she selected were Turman and Utah Wilson. This is testimony of eye and ear witnesses, and primary evidence as to what happened at a jail "show up." It does not say that Utah and Turman Wilson were the kidnapers; but it does say that they are similar in appearance to the kidnapers. It is material; it is relevant; and if it constitutes an extrajudicial identification as that term is ordinarily used, we choose to align ourselves with those courts which hold that such identifications are admissible; and we hold that the trial court did not err in admitting the challenged testimony.

The seventh assignment of error is that the trial court erred in refusing to permit Mrs. Cleo Wilson (a theater usherette and no relation to the appellants) to testify to a conversation with appellants in the Playhouse Theater in Portland, Oregon, at a time fixed by her as having been in March, 1950.

The trial court refused to permit Mrs. Wilson to testify to the substance of the conversation because she was unable to fix the date any closer than that it was sometime in the month of March. Appellants argue that Turman testified that he had been in the Playhouse Theater only once during the month of March, and that was March 19th, so that the date of the conversation was definitely fixed. The difficulty with that argument is that Turman had not testified at the time of the claimed error, and there was nothing before the court and jury at that time by which to fix the date of the conversation, other than Mrs. Cleo Wilson's

statement that it was in March. The offer was not renewed after Turman and another usherette had fixed the date as March 19th.

 If the substance of the conversation (as distinguished from the fact that there had been a conversation) was admissible for any purpose (and what the purpose could be is not too clear), its exclusion was not prejudicial. The witness was one of the alibi witnesses. She testified that she saw Turman and Utah in the theater one evening in March and had a conversation with them at about 8:30 or 9:00 p. m. Another usherette testified that Turman and Utah were in the theater at about that hour on March 19th and that Cleo Wilson had a conversation with them, and that she (the witness) also had a conversation with them at that time. Turman testified that he was in that theater only once in March of 1950, and that was on the 19th, and he repeated the conversation in detail. It would have added nothing to the case to have had Cleo Wilson give the substance of the conversation; it was the fact that there was a conversation at that time and place, and not what was said, that was of value to the appellants. The trial court's ruling was neither erroneous nor prejudicial.

The eighth assignment of error is that the trial court erred in refusing to admit exhibit No. 65 for identification, that being the original time book of Mrs. Cleo Wilson, the head usherette at the Playhouse Theatre. The purpose was to show that one of the alibi witnesses, Betty Lyon, worked at the Playhouse Theatre on the night of Sunday, March 19th.

Exhibit No. 65 was cumulative only, as exhibit No. 47, prepared by Mrs. Cleo Wilson and showing the actual periods that each girl, including Betty Lyon, worked in the theater on Saturday, Sunday, and Monday, March 18th, 19th, and 20th, had already been admitted. In addition, there was positive testimony of Cleo Wilson and Betty Lyon that the latter was at the Playhouse Theatre March 19th. Exhibit No. 65 gave the number of hours that Betty Lyon worked March 19th, but not the time of day; exhibit No. 47 showed the periods during which she was on duty.

The offered exhibit being only cumulative, the trial court's refusal to admit it was not error. *State v. Falsetta*, 43 Wash. 159, 86 Pac. 168; *Girardi v. Union High School Dist. No. 1*, 200 Wash. 21, 93 P. (2d) 298; *Braack v. Bailey*, 32 Wn. (2d) 60, 200 P. (2d) 525.

The ninth and tenth assignments of error relate to instructions given and refused. The appellants' proposed instructions are not properly before us, not having been included in the statement of facts as required by Rule of Supreme Court 9 (6) (presently Rule on Appeal 34 (8)).

The appellants' only exception to the failure to give their requested instructions was that they

" . . . except to the Court's refusal to submit to the jury each and every one of the defendants' requested instructions as submitted by said defendants."

This is not "sufficiently specific to apprise the judge of the points of law or questions of fact in dispute," as required by Rule of Practice 10.

We have consistently held that a review cannot be predicated upon error in giving an instruction or refusing a requested instruction if the exception was too general to be effective in calling the court's attention to any error. *Franks v. Department of Labor & Industries*, 35 Wn. (2d) 763, 768, 215 P. (2d) 416, and cases there cited.

Despite the failure of appellants to comply with these rules, we have carefully scrutinized the instructions complained of and the proposed instructions, and find no cause for criticism of the trial court in the instructions given or in its refusal to give the appellants requested instructions.

The eleventh and final assignment of error is that the trial court erred in denying appellants' motion for a new trial.

The verdict of the jury was received June 28, 1950. The motion for a new trial was timely filed, June 30, 1950, on the following grounds:

"1. Errors of law occurring at the trial and duly excepted to by said defendants, and each of them;
"2. The verdict is contrary to law and evidence."

What has heretofore been said disposes of these grounds for a new trial on this assignment of error.

August 4, 1950, long after the two-day period after verdict within which a motion for a new trial must be filed (Rem. Rev. Stat., § 2181 [P.P.C. § 136-1]), the appellants served and filed what they denominated a "Supplemental Motion for New Trial," on the ground of

"Newly discovered evidence material for the defendants, which they could not have discovered with reasonable diligence, and produced at the trial,"

supported by the affidavit of Eva Adams stating that Turman and Utah Wilson sat next to her in the Playhouse Theatre March 19, 1950, and that they were there from 9:00 p. m. until after midnight. (There was also an affidavit, to which we attach no weight, of a gentleman who accompanied her to the theater but who went no further than to say that two young men sat next to Miss Adams and that he felt satisfied that he could identify the young men if he had an opportunity to see them.)

This motion was in no sense a supplement; it was a new motion on a ground not before suggested, and labeling it a supplemental motion did not make it so.

Despite our view that the "supplemental" motion was not timely, we have examined the so-called newly discovered evidence in the light of our holdings as to the five elements which must be present to warrant the granting of a new trial on that ground. As was said in *State v. Adams*, 181 Wash. 222, 229, 43 P. (2d) 1:

"The rule is now settled in this state that, to warrant the granting of a new trial on the ground of newly discovered evidence, it must appear (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching."

It is our view that the evidence offered meets only one, or at most two, of those tests. It is conceded to be material

to the issue of alibi. Whether it is merely cumulative seems to be an open question.

Appellants had both testified that they were in the theater from 9:00 p. m., March 19th, until after midnight; hence, the evidence offered could be said to be merely cumulative. On the other hand, it is the only testimony offered other than that of the appellants themselves that places them in the theater after 9:30 p. m.

In *O'Toole v. Faulkner*, 34 Wash. 371, 75 Pac. 975, we held that, although the only testimony on a certain point is that of a party or other interested witness, evidence by a disinterested party on that point is still cumulative. We quoted as a reason therefor a statement in *Fox v. Reynolds*, 24 Ind. 46, as follows:

" 'Any other construction would enable a party to experiment by first offering himself as a witness and then, in case the jury disbelieved him, look about with increased diligence for newly discovered *cumulative* evidence.' "

However, in *State v. Miles*, 168 Wash. 654, 13 P. (2d) 48, where the court was considering whether there should have been a continuance to receive the testimony of an absent witness (the wife of one of three defendants in a burglary case, all of whom had testified to an alibi), we said:

"The testimony of the absent witness to establish an alibi for her husband and the other appellants was competent and material, and would not have been merely cumulative."

(It was held, however, that her testimony would not have changed the result, and that due diligence was lacking.)

In view of this difference of view in our own opinions as to what constitutes cumulative evidence, we will concede *arguendo* that the testimony of Eva Adams would not have been cumulative, or that, if cumulative, that element should be disregarded under the present circumstances. (See excellent annotation, 158 A. L. R. 1253, "Newly discovered evidence, corroborating testimony given only by a party or other interested witness, as ground for new trial," with the conclusion that, if such evidence would render a different

result probable on a new trial, the rule against cumulative evidence should become inoperative.)

Mr. Irvin Goodman, one of the attorneys for the appellants, told the trial court:

"With reference to Eva Adams, she did reach me through Attorney Leo Levenson, my office associate, about three days before the Wilson case went to the jury. To my best recollection it was on Sunday. She stated that for business and personal reasons she could not possibly become involved, have her name publicly mentioned, and involve anyone else, without first procuring their consent. We were, therefore, unable to produce the information from Eva Adams until after the jury had rendered its verdict because it was not available to us. We were not in a position to produce this information before the trial was concluded."

 There was no affidavit setting forth any facts in justification of the failure to make some effort to have Eva Adams as a witness at the trial, or to take her deposition if she would not come to Clark county, Washington, to testify. The foregoing statement by counsel is the only excuse offered for the delay in advising the court of this evidence. It is a new and, to us, unattractive suggestion that material witnesses can refuse to testify for business and personal reasons. It is our view that her evidence was discovered before the trial and that, with due diligence, it could have been available at the trial. See *State v. McChesney*, 114 Wash. 208, 195 Pac. 221; *State v. Sweeney*, 135 Wash. 276, 237 Pac. 507; *State v. Douglas*, 193 Wash. 425, 75 P. (2d) 1005.

Finally, from the facts heretofore set forth in this opinion, it is manifest that there is no probability that the testimony of Eva Adams would have changed the result. The fingerprint identification of Utah is the most certain known to the law. 2 Wigmore on Evidence (3d ed.) 389, § 414.

The trial court did not err in overruling the motion for a new trial.

Because this is a capital case, we have given consideration to all of the assignments of error, although the instructions and proposed instructions are not properly before us and the so-called supplemental motion for a new trial was

not timely; and we have found no prejudicial error anywhere in the record. The appellants had a fair trial, and we cannot see how the jury could have arrived at any other verdict than it did, even had all the excluded and the so-called newly discovered evidence been presented to it.

The conviction of both appellants on both counts is affirmed.

ALL CONCUR.

July 13, 1951. Petition for rehearing denied.

