No. 20822.

DAVE GALLEGOS, ET AL. *v.*
THE PEOPLE OF THE STATE OF COLORADO.
(403 P.2d 864)

Decided July 6, 1965. Rehearing denied August 3, 1965.

486

ROBERT T. KINGSLEY and BEN KLEIN, for plaintiffs in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, JAMES W. CREAMER, JR., Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE FRANTZ delivered the opinion of the Court.

DAVE and Toby Gallegos are brothers. They were convicted of first degree murder and sentenced to imprisonment for life. By their writ of error they claim that the lower court committed reversible error in eight particulars, namely:

1. In admitting Exhibit "O," a police report, in evidence;

2. In admitting the testimony of an officer relaying a description given him by a witness;

3. Procedurally and substantively, by the manner in which it dealt with the refusal of a witness to testify on constitutional grounds of self-incrimination;

4. In allowing the prosecution to ask leading questions of its witness, in that there was not a proper showing of surprise;

5. In refusing to allow defense counsel to impeach witnesses on cross-examination by showing their bias, interest, and motives;

6. In instructing the jury on flight, in that there was not evidence thereof, and in that it was an inadequate instruction;

7. In refusing to strike the non-responsive answer of a witness, "Your defendants had already been identified";

8. Receiving a jury verdict which was contrary to the law and the evidence.

In large measure the identity of the two persons who participated in the slaying of Joseph A. Florez is central to these grounds of asserted error. In fine, the two Gallegoses have made identification the cruical fact of this case.

From the record we learn that Florez owned and operated a junk yard at 2639 Larimer Street in Denver. On September 20, 1961, Florez was shot and killed during

an attempted robbery at his place of business by one of two masked gunmen who appeared during the noon hour at a time fixed between 12:50 and 12:57 P.M. At the time, one Simon Rogas, the father-in-law of Florez, was in the premises.

The two gunmen entered the premises, and one approached Rogas, who was sitting in a chair near the entrance, and told him to remain seated. Rogas, suspecting horseplay, did not take the gunman seriously, but the gunman soon convinced him that he meant business.

The other gunman went to the rear of the junk shop, where Florez was working. These two soon appeared, walking toward the front of the shop, at which point one Joseph Hoskins made his appearance. At his appearance, one of the gunmen shot Florez. Both gunmen immediately left the building and fled down an alley.

At the trial, Lena Harmon, who was at the time staying with her father at 1191 - 27th Street, stated that she saw the brothers Gallegos running across the street and entering the premises in which she was staying. She testified that, while they were running, they were trying to remove something from their faces. She said that, after entering the premises, she saw a gun on the radio and that the brothers Gallegos wanted her to drive them to 23rd and Glenarm.

In the course of her testimony, the following took place:

"Q. Directing your attention to the testimony on the witness stand you gave this morning, you were specifically asked whether or not you heard any conversation between David and Toby Gallegos. Do you remember that?

"A. Yes.

"MR. HOFFMAN: Your Honor, I would like to advise the witness that under the provisions of Article II of the Constitution of the State of Colorado and the Fourteenth Amendment to the Constitution of the United States that

she may, if she so desires, refuse to answer this question on the grounds that it may incriminate her.

"THE WITNESS: I refuse to answer this question on the ground it might incriminate me.

"THE COURT: It's the Court's opinion, Mrs. Harmon, that you must answer the question, so please answer it.

"MR. KINGSLEY: Note our exception to the ruling of the Court.

"MR. URSO: Will you please answer the question.

"A. Yes, I heard something to the effect, 'You should have hit him over the head instead of killing him,' or something like that.

"Q. (by Mr. Urso) You should have hit him over the head instead of killing him?

"A. Yes.

"Q. And this was at 1191 - 27th Street shortly after the noon hour on September 20, 1961?

"MR. HOFFMAN: Your Honor, again I wish to advise the witness that she has a right to refuse to answer if it may incriminate her, and ask for the Court's ruling.

"THE COURT: She has to answer that.

"THE WITNESS: I refuse to answer on the ground it might incriminate me.

"MR. URSO: It's the Court's ruling that you must answer the question.

"MR. KINGSLEY: Exception.

"MR. URSO: Will you please answer the question?

"A. Yes.

\* \* \*

"Q. (by Mr. Urso) Mrs. Harmon, do you know which of the two defendants said this?

"MR. KINGSLEY: Objected to, Your Honor, for the reason that there is no evidence in the record, yet at least, that either of the defendants said this. She said she heard it.

"THE COURT: Objection sustained. You may ask another question.

"Q. (by Mr. Urso) You heard this, Mrs. Harmon?

"MR. HOFFMAN: I believe we didn't have a ruling on whether or not she should answer, or maybe I'm wrong or got lost.

"MR. URSO: The objection to the question was sustained. I asked another question.

"THE WITNESS: I refuse to answer on the ground it might incriminate me.

"THE COURT: The Court rules that you must answer.

"MR. KINGSLEY: Exception.

"A. I don't know who it was said it.

"Q. (by Mr. Urso) But it was one of the two defendants?

"MR. HOFFMAN: Again I advise you may refuse to answer.

"THE WITNESS: I refuse to answer on the grounds it might incriminate me.

"THE COURT: It's the Court's ruling that you must answer.

"MR. KINGSLEY: Exception.

"A. Yes, I guess."

Another witness who testified on behalf of the People was Rudy Hidalgo. He, too, was at 1191 - 27th Street on the same day. According to him, the brothers Gallegos walked into the front room of the premises and "lay three pistols on top of a radio there, and started talking about going to rob a place, I don't know where." He said he overheard the conversation between the brothers Gallegos in which they said "they had to go some place and be there at noon or a little after to catch the man alone."

He also told the court and jury about how he saw them running. He noted that "they had their handkerchiefs just pulled down above their face." After they entered the apartment, they put the pistols back on the radio. His testimony further discloses:

"Q. Did you hear any conversation between the two defendants at that time?

"A. Well, Toby had tears in his eyes, telling his brother why did he have to kill him for."

They, then, according to Hidalgo, took off their jackets and their handkerchiefs and finally got Lena to drive them away.

1191 - 27th Street is over one block and around the corner from the junk yard owned by Florez.

To this point we have sketched the evidence with a broad brush. Other evidence must necessarily be particularized hereinafter as it relates to the ground of error being considered.

1. Was Exhibit "O" improperly admitted in evidence? Exhibit "O" is a printed form, designated "Offense Report," containing blanks which were filled in by the reporting officer, D. Myers.

Officer Myers testified that he had called headquarters for a Spanish-speaking officer after his arrival at 2639 Larimer Street. This was done so that a statement could be taken from the eye-witness to the slaying, Simon Rogas. Officer Nieto translated for Officer Myers, who wrote the information in the report along with his own statement of the conditions he observed upon his arrival.

Defense counsel, on cross-examination of Myers, asked him to refresh his recollection of the time of the event from the report. Thereafter the report was offered in evidence by the People during Nieto's testimony concerning his conversation with Rogas. The defense objected to its admission as hearsay, and as twice-told hearsay in part because it represented a translated version of Rogas' story. It was received in evidence over defendants' objection.

█ The lower court admitted Exhibit "O" in evidence on the theory that, if part of a document is used for refreshing recollection on cross-examination, all of the document upon request is admissible in evidence. This theory has been advanced on occasion before the courts, has been the subject of some study, and has been

productive of different or disparate opinions. We are committed to the rule that admits in evidence only those other parts of the statement which have relevant reference to that part of the statement already made known to court and jury. *Wilder v. People,* 86 Colo. 35, 278 Pac. 594, 65 A.L.R. 1260.

■ The general rule in criminal and civil cases is that a witness may not testify to another's statements made in conversation through an interpreter, because such testimony, being based upon interpretation rather than personal knowledge, is hearsay. *State v. Fong Loon,* 29 Ida. 248, 158 Pac. 233, L.R.A. 1916 F, 1198; *Boyd v. State,* 78 Tex. Crim. 28, 180 S.W. 230; see 116 A.L.R. 800; *Sharp v. McIntire,* 23 Colo. 99, 46 Pac. 115.

At first blush these evidentiary rules would seem to require a reversal. But on a more extensive analysis we hold that other rules have application and are controlling. These other rules are operable by reason of the circumstances as they developed in the course of the trial.

The record discloses that all three persons involved in the compilation of Exhibit "O" were called to the stand and testified to its contents. Conceding this to be true, counsel contend that there are discrepancies between the exhibit and the testimony of Rogas. Officer Nieto was subjected to a long and searching cross-examination, as were Rogas and Officer Myers. The defense had and used every effort to discredit their testimony.

Identification was inconclusive; it related to the sex, nationality, approximate ages, height, build, weight, complexion, and hair of the masked gunmen. At the trial, Rogas' testimony was slightly variant in some respects from that which he stated in the exhibit and in a few respects lacked what was given therein.

■ There is a growing body of law which recognizes the worthiness of an extrajudicial identification, and holds testimony thereof admissible. *Dawkins v. Chavez,* 132 Colo. 61, 285 P.2d 821; *People v. Slobidion,* 31 Cal. 2d 555, 191 P.2d 1; *State v. Wilson,* 38 Wash.2d 593,

231 P.2d 288; 4 Wigmore, Evidence § 1130 (3rd ed.); 1 Wharton's Crim. Evid. § 181 (12th ed.); 71 A.L.R.2d 449; Morgan, "Hearsay Dangers and the Application of the Hearsay Concept," 62 Harv. L. Rev. 177, 192; Schley, "Prior Identification Evidence and the Hearsay Objection," 30 Rocky Mtn. L. Rev. 332.

As an exception to the hearsay rule, its application has been extended to the admission of the testimony of a third person who heard or observed the extrajudicial identification under consideration, *Di Carlo v. United States*, 6 F.2d 364; *People v. Slobodion, supra; State v. Findling*, 123 Minn. 413, 144 N.W. 142; see *Trujillo v. People*, 112 Colo. 91, 146 P.2d 896; and admissibility is particularly sanctioned in cases where the identifier testifies at the trial, *People v. Slobodion, supra; State v. Frost*, 105 Conn. 326, 135 Atl. 446; *Di Carlo v. United States, supra;* 71 A.L.R.2d 487 and 491; Rule 504, Model Code of Evidence.

That identification is circumstantial and does not have the conclusiveness resulting from recognition of the persons charged does not militate against the use of the rule. *State v. Wilson, supra.* Uncertainty of identification under circumstances here present involves the weight to be given such testimony rather than its admissibility. *Bingham v. People*, 157 Colo. 92, 401 P.2d 255; *People v. Spinuzzi*, 149 Colo. 391, 369 P.2d 427.

Whatever discrepancies or differences were shown to exist between testimony and extrajudicial identification could possibly cast doubt on the verity of one or the other, a matter conceivably advantageous to the two Gallegoses. Certainly these disparities could not aid the prosecution. *Granato v. People*, 97 Colo. 303; 49 P.2d 431. See *Tashima v. State*, 58 Colo. 98, 144 Pac. 200; *Allison v. People*, 109 Colo. 295, 125 P.2d 146.

Such portions of the exhibit as represented the personal observations of the officer were cumulative. Competent evidence on such matters was introduced, and hence, error, if any, in admitting such portions of the

exhibit is harmless and affords no cause for reversal. *Majors v. People,* 38 Colo. 437, 88 Pac. 636; *Smith v. People,* 39 Colo. 202, 88 Pac. 1072.

In connection with these matters, it should again be observed that Officer Myers testified and submitted to probing cross-examination.

 We find no error in the admission of Exhibit "O" insofar as it contains extrajudicial identificatory matter; and in connection with other matter appearing therein, we hold that error, if any, in its admission is harmless, or, possibly in some respects, advantageous to the brothers Gallegos.

2. Claimed error is based upon the action of the trial court in allowing Officer Nieto to testify, over the Gallegoses' objection, to the description given him by Rogas at the scene of the slaying. What we said in the disposition of the Gallegoses' first contention has application to their specification of error in this respect; therefore, we pass to their third asserted error.

3. It is said in respect to the trial court's treatment of claimed self-incrimination that it constituted error procedurally and substantively.

During the course of the prosecution's examination of Lena Harmon, the prosecution claimed surprise because her testimony was in conflict with a statement she made to an officer in California. The attorneys argued the matter of defense objections out of the presence of the jury, where defense counsel advised the court that in their opinion she could be incriminating herself. This conclusion was based on the prior statement she had given which was in the hands of the prosecution.

The court, after defense counsel's suggestion, appointed an attorney to advise her in the matter. After a study of the question and conference with the witness, the appointed attorney advised the court that she would indeed be incriminating herself and he could do naught but advise her to refuse to answer.

The court took the position that she had waived her right to the point where she had testified, but that she could claim the privilege as to those matters not testified to and not related to testimony she had already given. The court further ruled the prosecution could ask leading questions, finding there was a foundation for the claimed surprise. The prosecution and the defense then conducted an examination of the witness in chambers, during which the prosecution would ask a question, the witness' appointed attorney would advise her not to answer, she would refuse, the court would order her to answer, exception of the defense would be noted, and she would then answer the question.

This procedure was repeated five times, continuing until the court felt the testimony had gone beyond the point where she had waived her right. The court sustained the objection to Question Number Five. This identical procedure was followed in the court room in the presence of the jury.

■ There can be no doubt that a witness by taking the stand and testifying can waive the privilege, *People v. McPhail*, 118 Colo. 478, 197 P.2d 315, but waiver requires knowledge of testimonial privilege and willingness to testify notwithstanding its protection. *Radinsky v. People*, 66 Colo. 179, 180 Pac. 88.

The record is completely devoid of any inference that the prosecution knew, at the time the witness was called to testify initially, that she would invoke her privilege. However, the attorneys and the court were certainly fully aware of the problem after the session in chambers. Each made an effort to judiciously handle the problem.

■ Some jurisdictions have recognized that prejudicial error may arise where the prosecution calls a witness for the purpose of extracting from him a claim of privilege against self-incrimination. *De Gesualdo v. People*, 147 Colo. 426, 364 P.2d 374, 86 A.L.R.2d 1435; *United States v. Tucker*, 267 F.2d 212; *United States v. Maloney*, 262 F.2d 525; *United States v. Figlia Mia*

*Brand,* 179 F.2d 519; *Commonwealth v. Granito,* 326 Mass. 494, 95 N.E.2d 539; *Washburn v. State,* 164 Tex. Crim. 448, 299 S.W.2d 706; *Rice v. State,* 121 Tex. Crim. 68, 51 S.W.2d 364; 123 Tex. Crim. 326, 59 S.W.2d 119; *McClure v. State,* 95 Tex. Crim. 53, 251 S.W. 1099; *Garland v. State,* 51 Tex. Crim. 643, 104 S.W. 898.

In *De Gesualdo v. People, supra,* this Court said, " . . . we take notice that in the public mind an odium surrounds the claim of constitutional privilege by a witness in refusing to testify on the ground that his testimony would tend to incriminate him."

The above cases are predicated upon the proposition that the prosecution had knowledge or had reason to know of the claim of privilege, or that it had no reason to believe the privilege would not be waived. The witness must in fact have a right to invoke the privilege based upon timely objection.

We regard the "odium" surrounding the invocation by a witness of the privilege against self-incrimination to be non-existent in the instant case. She invoked, with one exception, to no avail. The court and jury heard her answers, and herein is the distinction between this case and the *De Gesualdo* case, *supra.* In the *De Gesualdo* case, odium attached because of the mystery of that which was unanswered.

The two Gallegoses could derive no benefit from their resistance to Lena Harmon testifying, on the ground of her self-incrimination. The privilege against self-incrimination is for the protection of the witness, and not for the protection of an accused or other parties. *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819. "[T]he privilege of not testifying to facts which tend to criminate is a privilege of the witness alone." *Barr v. People,* 30 Colo 522, 71 Pac. 392; *Lothrop v. Roberts,* 16 Colo. 250, 27 Pac. 698.

Before we proceed to the next assigned error, we would admonish that the procedure adopted here should not be followed. Once the trial court in camera became

aware that privilege would be claimed, it should have required that the record in respect thereto be made out of the presence of the jury, and then conducted the remainder of her interrogation in the presence of the jury without her counsel's admonitions, only stopping her testimony at the point where her waiver no longer applied.

 4. The defense argues that there was no showing of surprise and, therefore, no right to ask leading questions of witness Harmon. After the court had allowed the prosecution to lead the witness, the following testimony was given:

"Q. Directing your attention to the testimony on the witness stand you gave this morning, you were specifically asked whether or not you heard any conversation between David and Toby Gallegos. Do you remember that?

"A. Yes."

She then volunteered the following:

"A. Yes, I heard something to the effect, 'You should have hit him over the head instead of killing him' or something like that."

This answer was not responsive and was contrary to her previous testimony. No objection was made nor was a motion to strike made. This evidence thus came in, but not in response to a leading question. It was not the result of the court's order. Therefore, since this evidence became part of the case outside of the court's ruling, we cannot see that lack of foundation — if, in fact, there was such a lack — becomes an issue on which error can be predicated. In fact, the subsequent questions were not suggestive of an answer but were merely statements of evidence previously testified to.

5. The Messrs. Gallegos contend that error was committed by the trial court in its failure to allow them on cross-examination to inquire into matters tending to show motive and bias of Lena Harmon and Rudy Hidalgo, witnesses for the People.

a) Mrs. Harmon had been required by the trial court to make answers to certain questions propounded to her on direct examination, notwithstanding her contention that she should be protected by the testimonial privilege afforded witnesses.

On cross-examination she was asked, "Now, as I understand it, previously — had you ever had any conversation with Sergeant Montoya?" She refused to answer on the ground that her response might be incriminating. The trial court was notified that the defense sought to show "any conversation" she had with Sergeant Montoya indicating that the witness had a bias, prejudice, or interest in testifying. Her claim of privilege was nevertheless sustained.

Upon completion of the evidence for the People, and after the People had rested, the brothers Gallegos moved for a judgment of acquittal on the theory of a failure of proof of their guilt beyond a reasonable doubt. This motion was denied.

It was at this point in the proceedings that the defense apprised the trial court that "with regard to the court's ruling limiting our cross-examination of Lena Harmon, we make an offer of proof that the questions we would have asked Mrs. Harmon were whether or not she did not have conversations with Sergeant Montoya; that Sergeant Montoya told her that he had witnesses who had seen Eva and Pat coming out of the alley, and that unless something was done, he was going to file murder charges against Pat . . . ; that thereafter she made the statements which she made in an effort to assist Pat, made these statements of the things that Sergeant Montoya told her to testify to with regard to the witness Rudy Hidalgo."

The "Pat" referred to in this statement of proposed interrogation was Patricia Acosta, the daughter of Lena Harmon. No change in the ruling of the trial court, however, was effectuated by the statement of the defense

concerning what it would like to elicit from Lena Harmon in cross-examination.

A general question had been asked on cross-examination and the trial court had ruled, pursuant to her objection, that Lena Harmon need not answer because it might extract self-incriminating evidence. The defense then merely advised the court that it was seeking by the general question to show the bias, prejudice, or interest of the witness; it in no way indicated to the court at that time the content of any further proposed interrogation in order to give the court an opportunity to determine whether the information sought would be outside the pale of testimonial privilege.

 To state to the trial court the proposed area of interrogation of the People's witness after the People have rested their case, in an effort to show to the court that such inquiry would not lead to self-incrimination, comes too late. It is, in effect, an attempt on the part of the defense to re-open the People's case. At the time the defense informed the court of its questions relating to non-incriminatory matter, there was no People's witness to be further cross-examined. See *Rustin v. Prudential Ins. Co.,* 27 Ohio App. 466, 161 N.E. 561; *State v. Martin,* 53 N.M. 413, 209 P.2d 525; *United States v. Ritchie,* 128 F.2d 798.

 Ordinarily, cross-examination of a witness for the People should be made before that witness leaves the stand. *Moeller v. People,* 70 Colo. 223, 199 Pac. 414. Certainly, as a general rule, any stated purpose of cross-examination, when such becomes necessary, as here, should be made before the People rest.

b) As to the witness Hidalgo, it is our view that, under the circumstances of this case, no error was committed in the trial court's denial of cross-examination regarding his incarceration in jail. Hidalgo was a key witness, and his testimony was obviously crucial to the People's case.

In the course of cross-examination he was asked,

"What were you in jail for?" The People's objection to this question was sustained by the trial court. At that time the defense informed the court that they would like to ascertain if Hidalgo entertained any bias, interest, or motive in testifying. The trial court adhered to its ruling and refused to permit an answer to the question.

Later, Hidalgo was asked on further cross-examination, "Were you confined in the county jail at the time?" Objection by the People was sustained, and the defense did nothing further on this matter of his being jailed.

Again, after the motion for judgment of acquittal had been denied by the trial court, the defense advised the court that it intended by its questioning to show that Hidalgo was held in jail on serious charges, and "that in exchange for the statement which he gave that these charges were reduced or dismissed or something like that."

It is not error for the trial court to refuse to permit questions on cross-examination where the information sought to be elicited does not obviously have a relevancy to the case. To state the purpose of such cross-examination in unrevealing, general terms is not sufficient. The purpose of cross-examination in such case should indicate the relevancy of the information sought to be elicited. *Olguin v. People,* 115 Colo. 147, 170 P.2d 285.

In context it would require speculation on the part of a trial court to know the specific purpose for which the defense sought to interrogate Hidalgo as to his imprisonment. Giving the specific purpose after the People have rested would ordinarily come too late, as we have shown by our treatment of the question of bias, interest, and motive of the witness Lena Harmon.

6. The defense complains that the instruction on flight was erroneously given, in that there was not sufficient evidence to support such an instruction. We note that the instruction given was set forth with approval in *Robinson v. People,* 114 Colo. 381, 165 P.2d

763. We can find no fault with the instruction; therefore, the question is whether it was applicable under the facts of this case.

A review of the transcript reveals that the assailants, who had their faces covered, were seen running from the scene of the crime; that the defendants were seen shortly threafter with some kind of cloth material on their necks; that one of the defendants was heard to say, "You should have hit him instead of shooting him"; that Toby Gallegos left for California in a rented car; and that he was concealed during this time to the time of the arrest in California. There is other evidence bearing upon this issue, but we conclude under this evidence that the court properly instructed the jury. All the elements are present.

We do not agree that the jury was in effect instructed that Toby Gallegos had in fact fled. Under the instruction, the jury was required to first find that Toby Gallegos did in fact flee before they could consider this evidence a circumstance tending to establish guilt or innocence. We see no error.

7. In response to defense counsel's question asking witness Montoya how he fixed a certain date, the witness responded, "I had learned the identity of your defendants on the 25th . . ." Counsel asked that the answer be stricken. The court refused. Counsel contends that this was prejudicial in that it is laden with an assumption of guilt or a legal conclusion. We find no merit in this contention.

The statement as outlined above is not pregnant with the connotations attributed to it; to say he identified the defendants does not give rise to the conclusion that they were, therefore, guilty of the crime charged. The incident is clearly distinguishable from *McKee v. People,* 69 Colo. 580, 195 Pac. 649, a case cited in support of defendants' position. In that case, a medical doctor was asked whether he had made the statement to another person that he was of the opinion the defendant was

guilty. Such a proposition was not before the court here.

8. There is no merit in the contention that the verdict was contrary to the law and the evidence. A consideration of the evidence already discussed in this opinion establishes its amplitude to warrant the verdict returned by the jury. To recite additional evidence would result in unnecessarily lengthening, without purpose, an already long opinion.

The judgment is affirmed.