244 A.2d 842.

STATE *vs.* HELEVE E. NORDSTROM.

AUGUST 9, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. This case could, in a manner of speaking, be described as a companion case to *State v. Nordstrom,* 104 R. I. 471, 244 A.2d 837. The defendant here and the defendant there are one and the same person. The record shows that the defendant is sometimes known as "Alva" Nordstrom and at other times as "Heleve" Nordstrom. This is an indictment which charges the defendant with committing an indecent assault upon a seven-and-one-half-year-old girl in Scituate on March 22, 1964. After a superior court jury returned a verdict of guilty, the trial justice denied the defendant's motion for a new trial and sentenced him to a five-year term at the adult correctional institutions. In the instant appeal, the defendant has prosecuted 44 exceptions. Twenty-three of these exceptions refer to certain rulings of the trial justice relative to statements made by the child to her mother, her father and a 15-year-old friend of her brother. Nineteen of his exceptions were taken to rulings which permitted testimony of extrajudicial identifications made of the defendant by the victim. The final two exceptions were taken respectively to the denial of the defendant's motion for a directed verdict and his motion for a new trial.

We shall call the girl involved in the incident described

herein as "Jo."[1] At the time of the superior court trial she was nine years old. After the trial justice had made due inquiry as to Jo's competence, he permitted the girl to testify.

The record shows that Jo lived with her family in Scituate. Their home was located about 400 feet from a pond which was just off route 101. March 22, 1964 was Palm Sunday. On that day Jo left her home with a fishing rod and walked over to the pond to try her luck. As she made her first cast, the hook caught on her sweater. At this moment, a man in a convertible drove up to the edge of the pond, left his car and went to Jo's assistance. After helping the girl to untangle the hook, the motorist told Jo that he knew of a pond where the fishing was better and asked her to accompany him there. When Jo hesitated in acceding to this suggestion, she was told by her new-found friend that if she refused to go, he would drive off with the fishing rod, which belonged to her father. Jo then entered the convertible and she was driven off in an easterly direction on route 101.

They traveled about a mile and stopped alongside the waters of the Scituate Reservoir. Jo informed the driver that they could not fish there as it was a restricted area. The driver then drove off and turned into Quaker Lane headed in a westerly direction. Quaker Lane is a sparsely-settled back road which runs parallel to route 101. When Jo asked where they were going, he said that he was taking a short cut. There are numerous dirt roads or paths which run off this road. The driver pulled off the road onto one of the side roads and drank the contents of a soda bottle. He then threw the bottle out of the window, backed the car onto Quaker Lane, and proceeded a short distance further. Once again he pulled off the road. At this point Jo was crying. The motorist then took a pillow and placed

---

[1] We are using the middle name of the victim.

it on the armrest of the front door. While we do not deem it necessary to particularize the gruesome details which followed, the driver placed Jo on the front seat with her head on the pillow, pulled down her slacks and underpants, lay on top of her and fondled her private parts. All this time Jo was trying to push the man off her. He told the young girl that if she did not stop crying, he would get a stick and hit her. She repeatedly asked the assailant to let her out of the car. At long last, she was permitted to leave.

A 15-year-old friend of Jo's brother who lives on Davis Road in Scituate testified that he was standing in his front yard when he saw Jo running down the road. Davis Road runs in a northerly direction from route 101, and as it goes north it meets Quaker Lane. Kenneth, the 15-year-old, stated that as the girl entered the yard, she asked him to take her home. He testified that Jo told him that she had been "picked up by a guy" in a black and white convertible. Kenneth took Jo back through the woods to the pond where Jo's parents and others were gathered. They went through the woods because of Jo's fear that the convertible was still in the neighborhood.

Jo's parents were at the pond because, having noticed the absence of the daughter, they thought she might have fallen into the water. The mother told the court and jury that as her daughter ran up to her, Jo was crying and practically hysterical as she recited her experiences of the past half hour. She told her parents the car in which she had ridden was either a Chevrolet or a Cadillac, black and white convertible—a white body with a black roof. Jo also said the car contained a pillow and a blanket or quilt. The state police were called and an investigation was commenced which culminated in the arrest of defendant on January 11, 1965.

At the trial, an officer of the Cranston police department

testified that on the evening of March 31, 1964, he stopped defendant on Fletcher Avenue in Cranston for a motor vehicle offense. The officer described the motor vehicle being operated by defendant at the time as a black and white Cadillac convertible. His search of the car disclosed a pillow and a quilted blanket on the rear seat. At this time, however, the Cranston officer was completely unaware of the Scituate assault. When pressed by defense as to why he remembered this car, the officer replied that he had pursued it at speeds approaching 100 miles an hour. A chase at such a speed, this officer observed, makes one remember the car involved. The defendant was arrested and charged on August 27, 1964, with the assault on the five-and-one-half-year-old girl described in the other Nordstrom appeal. He was brought before the Ninth District Court where he pleaded not guilty. He was unable to furnish bail and was remitted to the adult correctional institutions. The next day the state police took Jo and her parents to the prison. She was shown three men standing in a lineup. All the men were of the same build and were dressed identically. Jo was asked if she recognized any of them. She said yes and pointed to defendant. The defendant at this time was a patient at the medical section of the prison undergoing treatment for an alleged case of delirium tremens.

On January 11, 1965, Jo was brought to state police headquarters in Scituate and asked to look through a one-way mirror at an individual who was sitting some five feet away in an adjoining office. She did so and told the police that the man in the other room was the driver of the black and white convertible.

The individual identified at the prison and at the state police headquarters was defendant.

The defendant offered an alibi defense. Testimony was offered to show that he spent the entire Palm Sunday morning from 8 o'clock on at his daughter's home in Pawtucket.

Both defendant's daughter and her fiance testified as to his presence in the city on that date. Some of the defense witnesses acknowledged that during March, 1964, defendant drove a Cadillac convertible. They claimed, however, that the car was entirely white and not the black and white automobile described by the prosecution's witnesses.

Here, as in his other appeal, defendant contends that the testimony of Kenneth and Jo's parents relative to Jo's statements to them were not admissible as spontaneous declarations because they were the result of the girl's reflection and premeditation. We disagree. Approximately a half-hour elapsed between the time Jo left the pond in the convertible and her return with Kenneth. The 15-year-old boy said Jo looked "tired" when he first saw her. Her mother described her daughter as being nearly hysterical when she rejoined them. No purpose will be served by repeating the guiding principles to be applied in determining if Jo's statements were instinctive or deliberate. We have set them forth in *State* v. *Nordstrom, supra.* The trial justice acted properly in allowing the statements to become part of the record. It is obvious that the seven-and-one-half-year-old's statements were motivated and influenced by the traumatic time she had just spent in the convertible. To adopt an apt phrase used by the Oregon Supreme Court in *State* v. *Hutchison,* 222 Ore. 533, 353 P.2d 1047, it was Jo's harrowing experience which "prompted" her tongue as she spoke to Kenneth and her parents.

Furthermore, we disagree with defendant's position that if Jo's declarations were spontaneous, only that portion thereof in which she complained that she had been molested should have been admitted into evidence. If the statements are properly part of the res gestae, we see nothing in their contents which would bar their entire use. As we ruled in *State* v. *Murphy,* 16 R. I. 528, 17 A. 998, these statements are admissible as part of the transaction itself.

Such declarations, we said, spring so naturally and involuntarily from the thing done as to reveal its character and thus belong to it and be a part of it. Later in *State* v. *Badnelley,* 32 R. I. 378, 79 A. 834, we held that if a prosecutrix in a rape case uttered a statement which was properly part of the res gestae, what she said about the act was properly introduced into evidence. So, too, we think that the details in the instant case given by Jo to her brother's friend and to her father and mother were competent evidence for the jury's consideration. We can find no error in this portion of defendant's appeal.

As we see it, the main thrust of defendant's appeal is his objection to evidence which showed that Jo had identified defendant as her assailant on other occasions prior to her pointing him out in the courtroom as the man who assaulted her on a path off Quaker Lane. He argues that this evidence of extrajudicial identification is to be received only where the credibility of the identifying witness has been impeached or where there is a claim that the in-court identification was of recent invention. We do not agree.

From our study of Jo's testimony we are not persuaded that she testified as to any extrajudicial identification. She told the court and jury that she had gone to state police headquarters on various occasions to look at pictures of individuals who had been charged as child molesters. The girl said that she was "pretty sure" one of the pictures she saw was that of defendant. If, however, Jo did testify as to an out-of-court identification of defendant, we would rule that this evidence was admissible. As was pointed out in *People* v. *Gould,* 54 Cal.2d 621, 354 P.2d 865, that, unlike testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached, evidence of an extrajudicial identification is to be admitted regardless of whether the testimonial identification has been impeached.

This rule has evolved through the years. Formerly, any testimony about an earlier out-of-court identification was barred because of its hearsay nature. Today it is our belief that the prevailing view is that a witness's prior out-of-court identification of the accused, if made under circumstances precluding suspicion of unfairness or unreliability, is admissible to corroborate the witness's identification at the trial. 1 *Wharton's, Criminal Evidence* (12th ed.), §181, p. 359; 71 A. L. R.2d 449 and its later case service. The rationale given for this rule is the greater reliability and trustworthiness of such evidence as opposed to the witness's identification efforts at the trial and is aptly set forth in 4 Wigmore (3d ed.), *Evidence,* §1130, p. 208:

> "Ordinarily, when a witness is asked to *identify* the assailant, or thief, or other person who is the subject of his testimony, the witness' act of pointing out the accused (or other person), then and there in the courtroom, is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him.
>
> "The psychology of the situation is practically the same as when Recent Contrivance is alleged. To corroborate the witness, therefore, it is entirely proper * * * to prove that *at a former time,* when the suggestions of others could not have intervened to create a fancied recognition in the witness' mind, he recognized and declared the present accused to be the person. If, moreover (as sometimes is done) the person was then so placed among others that all probability of suggestion * * * is still further removed, the evidence becomes stronger. * * *"

While the foregoing rule is not accepted in all jurisdictions, the weight of authority is in accord with this reasoning. We think Professor Wigmore's observations that a courtroom identification is equatable to a situation where

the defense alleges that a witness's courtroom performance was of recent origin is particularly appropriate in this case. Jo was subjected to a vigorous and searching cross-examination about her identifying defendant as her attacker. Several times she was asked if she rehearsed or went over her testimony with her mother. If defendant did not specifically accuse the young witness with recently inventing her testimony, such a charge was implicit in several of his questions.

The admissibility of the pretrial identification has been extended by some courts to allow the testimony of third persons who heard or observed the identification in issue. Because of greater reliability of the prior identification, evidence of people who saw or heard it is admitted in some cases as an exception to the hearsay rule. *Basoff* v. *State,* 208 Md. 643, 119 A.2d 917; *Gallegos* v. *People,* 157 Colo. 484, 403 P.2d 864. Other courts, however, have sanctioned such evidence only when the identifier has testified in court and is available for cross-examination as to his early activities. *People* v. *Gould, supra; State* v. *Matlack,* 49 N. J. 491, 231 A.2d 369; *Johnson* v. *State,* 237 Md. 283, 206 A.2d 138; *Willis* v. *State,* Fla., 208 So.2d 458; see Edmund M. Morgan, "Hearsay Dangers And The Application Of The Hearsay Concept," 62 Harv. L. Rev. 177, pp. 192-196 (1948).

We hold therefore that the testimony of Jo's father and the two state policemen relative to the girl's identifying defendant at the adult correctional institutions[2] and later at the state police headquarters was admissible. We can find nothing relative to the lineup at the jail or the viewing

---

[2]Since the identification referred to in this opinion occurred prior to June 12 1967, the legal principles set forth in *United States* v. *Wade,* 388 U. S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and *Gilbert* v. *California,* 388 U. S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178, relative to right to counsel, have no applicability here. See *Stovall* v. *Denno,* 388 U. S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

in the barracks which would warrant any finding that they were held under circumstances that were either unfair or generated any degree of unreliability. The records show that Jo on a prior occasion had gone to headquarters and viewed another suspect through the one-way mirror and told the officers that the suspect was not her assailant. Furthermore, any alleged danger of hearsay is not present in this case because the nine-year-old girl was available for questioning by defendant, if he so desired, about the circumstances relative to her visit to the jail and the January visit to the state police. We therefore affirm the trial justice's action in admitting this evidence at the trial.

We find no merit in defendant's contentions that his motion for a directed verdict should have been granted. This court has laid down the rule that when such a motion is made, the trial justice shall view all the evidence and the reasonable inferences flowing therefrom in the light most favorable to the state and that if there be any evidence tending to support the charge, the motion should be denied. Applying this rule to the evidence presented in the superior court, we find that the court's denial of defendant's motion was well warranted.

Turning to the exception taken to the denial of the motion for a new trial, we have no hesitancy in approving the trial justice's action. In our opinion he properly performed his duty in passing upon this motion. The issue in this case boiled down to whether on Palm Sunday morning 1964, at the time Jo was assaulted, the defendant was in a convertible on a back road in Scituate or was he, as his witnesses testified, miles away in Pawtucket making crosses out of palm. In his decision the trial justice commented favorably on the testimony of the nine-year-old witness. He also placed reliance on the Cranston police officer who had stopped the defendant in a black and white Cadillac convertible about a week after the Scituate assault.

The trial justice remarked that he had no doubt that the defendant visited his daughter, but that the visit took place after the defendant left Scituate. The trial justice rendered a carefully considered decision in which he neither overlooked nor misconceived any material evidence. His decision was amply justified by the record.

All the defendant's exceptions are overruled, and the case is remitted to the superior court.

*Herbert F. DeSimone,* Attorney General, *Donald P. Ryan,* Assistant Attorney General, for plaintiff.

*Moses Kando,* Special Counsel for Public Defender, for defendant.