22CA1020 Peo v Kartabrata 12-11-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1020
City and County of Denver District Court No. 19CR3876
Honorable Edward D. Bronfin, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Bustaman Kartabrata,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE TOW
Lum and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 11, 2025

---

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kamela Maktabi, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Bustaman Kartabrata, appeals the judgment of conviction entered on a jury verdict finding him guilty of three counts of first degree murder and one count of felony menacing. We affirm.

## I.     Background

¶ 2     At trial, the prosecution presented the following evidence.

¶ 3     J.M., then twelve years old, testified that Kartabrata and J.M.'s paternal grandmother came to J.M.'s family's house.  After leaving the home and sitting in the car for a while, Kartabrata returned to the door.  When J.M.'s father opened the door, Kartabrata came inside and pulled a gun.  Kartabrata first shot J.M.'s father and then his mother.  J.M. asked his mother if she was okay, and she told him to run.  He saw Kartabrata going upstairs and into his sister's room, where his sister and maternal grandmother were.  As he ran out of the house, he heard glass break, which was the sound of his maternal grandmother escaping. He ran to nearby apartments, knocked on the door, and Beatrice Garcia answered.

¶ 4     Garcia testified that, after speaking briefly with J.M., she told her children to call 911.  J.M. testified that, after the police arrived,

1

he went back to the house with them and later got into a police car. Finally, he testified that he was driven somewhere and was interviewed.

¶ 5 Forensic interviewer Dulce Solis testified that she interviewed J.M., and the video of the interview was admitted into evidence and played for the jury.

¶ 6 The jury convicted Kartabrata of three counts of first degree murder and one count of felony menacing. He was sentenced to three terms of life in prison for the murders and an additional three years in prison for felony menacing, with the sentences to be served consecutively.

¶ 7 On appeal, Kartabrata contends that the trial court erred by (1) admitting hearsay statements under the excited utterance exception; (2) admitting evidence under the child hearsay statute, section 13-25-129, C.R.S. 2025; (3) failing to give the required child hearsay cautionary jury instruction; (4) allowing a lay witness to identify Kartabrata in a video exhibit; and (5) failing to disqualify one of the trial prosecutors, as well as the entire district attorney's office. We discern no reversible error.

## II.     Excited Utterances

¶ 8     Kartabrata contends that the trial court erred by admitting, as excited utterances, statements J.M. made to Garcia and to officers. We discern no error.

### A.     Additional Background

¶ 9     Garcia testified that after J.M. knocked on her door, he said, "Help me, help me, someone just killed my family." Defense counsel objected, and the trial court ruled that this evidence was admissible as an excited utterance under CRE 803(2) and a statement of J.M.'s then-existing state of mind under Rule 803(3). Garcia then testified,

> He was screaming, "Please help me; someone's killed my family and he's after me." He was very frantic. So my instinct was to grab him and bring him in the house because I had no idea if someone was chasing him or where it was coming from. I just didn't know, so I grabbed him and brought him in the house to ensure that he was okay.

She then said that she told her children to call 911, and as they were doing so, she asked J.M. questions. Defense counsel objected again on hearsay grounds, and the court again admitted the

evidence as an excited utterance and as a statement of J.M.'s state of mind. Garcia then testified,

> Okay. Like I said, I was questioning him. I asked him his name and age and where he lived. He was clear to his name and age [sic]. When we got to the address, he was just in such hysterics that he was mixing up the numbers. So he told me the street . . . and the numbers for his street address. I was trying to calm him down because I couldn't get the street address, and he just said there was a red Jeep with a Broncos sticker in front of his home, and that's how I would find the house . . . .
>
> That [Kartabrata] was with [J.M.'s] grandmother, but his grandmother wasn't shooting, just he was. And the way he was able to get back in the home was that he said he forgot something in there. He then shot his dad in the neck and he knows he was dead, and then he shot his mother. So he thought his mother was playing dead when he took off running . . . .
>
> He said, My sister was running up the stairs and she got shot as well, but I don't know if she's dead . . . .

¶ 10    Officer Mark Hall testified that when he arrived on scene, he placed J.M. in a police car because J.M. wanted to run back inside the house and was crying. The People then moved for admission of Officer Hall's body camera footage. Defense counsel objected on

hearsay grounds, and the court overruled the objection, again ruling this evidence admissible under the excited utterance exception in light of the testimony regarding J.M.'s emotional state.[1] The jury watched the body camera footage, and Officer Hall testified that J.M. identified the shooter as "Bustaman" in the video.

### B. Standard of Review and Applicable Law

¶ 11 We review a trial court's admission of evidence for an abuse of discretion. *People v. Hulsing*, 825 P.2d 1027, 1032 (Colo. App. 1991). A trial court abuses its discretion if its ruling misconstrues or misapplies the law or is manifestly arbitrary, unreasonable, or unfair. *People v. Gee*, 2015 COA 151, ¶ 23.

¶ 12 Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Generally, hearsay statements are presumptively inadmissible at trial, absent a relevant court rule or statute. CRE 802.

¶ 13 An excited utterance, however, is an exception to the rule against hearsay. CRE 803(2). An excited utterance is "[a]

---

[1] The trial court also ruled that the evidence was admissible under CRE 803(3).

5

statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.*

¶ 14 A statement may qualify under the excited utterance exception if

> (1) the occurrence or event was sufficiently startling to render inoperative the normal reflective thought processes of an observer; (2) the declarant's statement was a spontaneous reaction to the event; and (3) direct or circumstantial evidence supports an inference that the declarant had the opportunity to observe the startling event.

*People v. King,* 121 P.3d 234, 237-38 (Colo. App. 2005).

¶ 15 Factors to be considered in determining whether the statement was spontaneous include the lapse of time between the startling event and the out-of-court statement, whether the statement was made in response to an inquiry, whether the statement was accompanied by outward signs of excitement or emotional distress, and the choice of words employed by the declarant to describe the experience. *People v. Compan,* 100 P.3d 533, 536 (Colo. App. 2004), *aff'd,* 121 P.3d 876 (Colo. 2005), *overruled on other grounds by, Nicholls v. People,* 2017 CO 71.

¶ 16 "This exception has been liberally interpreted so as to extend to statements made following a lapse of time from the startling event itself." *Hulsing*, 825 P.2d at 1031. "And . . . the duration of stress will obviously vary with the intensity of the experience and the emotional endowment of the individual . . . ." *Id.*

## C. Application

¶ 17 Kartabrata contends that J.M.'s statements to Garcia were not admissible under the excited utterance exception because they occurred after the shooting and in response to her questions. He further contends that the event was not such as to render thought processes inoperative and that the statements were not spontaneous reactions.[2] We disagree.

¶ 18 J.M. testified that after his mother was shot, she told him to run; he ran out the back door, through the gate, went left twice, and ended up at the apartments behind the house; he knocked on the door of these apartments and Garcia answered. Based on this testimony, no more than a few minutes could have passed between the murders and J.M. talking to Garcia. We cannot say on these

---

[2] Kartabrata does not dispute that the event was startling or that J.M. had the opportunity to observe it.

facts that the trial court abused its discretion by determining that insufficient time had passed for "normal reflective thought processes." *King,* 121 P.3d at 237; *see People v. Martinez,* 18 P.3d 831, 835 (Colo. App. 2000) (victim's statement, made within fifteen or twenty minutes after she was removed from the scene, was an excited utterance); *People v. Fincham,* 799 P.2d 419, 423 (Colo. App. 1990) (allowing excited utterances of children made less than two hours after mother's abduction). Garcia also testified that J.M. was hysterical during their conversation.

¶ 19 Further, contrary to Kartabrata's assertion, the fact that J.M.'s statements were made in response to Garcia's questions does not preclude them from being excited utterances. *See Hulsing,* 825 P.2d at 1032 ("The excited utterance exception extends to statements made in response to questioning. And, an inquiry, especially when it is of a general nature and addressed to a young child is not sufficient to undo the underlying basis in reliability for the excited utterance exception." (citation omitted)). Thus, the trial court did not err by admitting J.M.'s statements to Garcia under the excited utterance exception.

¶ 20    Kartabrata also contends that J.M.'s statement identifying Kartabrata as the shooter on Officer Hall's body camera video was not admissible under the excited utterance exception because the interaction took place after J.M. returned to the crime scene and after he had been placed in the police car. He again contends that the situation was not such as to render J.M.'s thought processes inoperative and that the statements were not spontaneous reactions.[3] Again, we disagree.

¶ 21    Garcia's children called 911 while she was talking to J.M. Office Juan Gamboa testified that approximately five minutes passed between the 911 call and when he first interacted with J.M. He testified that after a quick back and forth with J.M., they ran over to the house, he got the exact address and aired it over the radio, and within seconds multiple police cars arrived. He then testified that after talking to another officer, they decided to put J.M. in the back of a police car. The body camera video shows J.M. emotionally interacting with police officers before he was put in the police car.

---

[3] Again, Kartabrata does not dispute that the event was startling or that J.M. had the opportunity to observe it.

¶ 22    Again, based on this evidence, the trial court did not abuse its discretion by determining that insufficient time had passed between the murders and J.M. talking to officers on the body camera video for J.M. to have had "normal reflective thought processes." The record also reflects that J.M. was crying and emotional while interacting with officers. Thus, the trial court did not err by admitting this evidence under the excited utterance exception. *See Hulsing*, 825 P.2d at 1032 (concluding that evidence of police questioning children "within 15-20 minutes of the time the police first arrived at the scene and within less than an hour after the children had witnessed or heard the incident occur," as well as children's emotional condition, was more than sufficient for the trial court to have admitted the statements under the excited utterance exception).[4]

### III.    Child Hearsay Statute

¶ 23    Kartabrata also contends that the trial court erred by admitting J.M.'s hearsay statements made during his forensic

---

[4] Because we conclude J.M.'s statements were admissible under the excited utterance exception, we do not need to address Kartabrata's challenge to their admission under CRE 803(3).

interview with Solis. He further contends that the court's failure to instruct the jury as required by the child hearsay statute, section 13-25-129(6), constitutes plain error and requires reversal of his conviction. We discern no reversible error.

## A. Additional Background

¶ 24 Before trial, the prosecution sought admission of J.M.'s statements to Solis under section 13-25-129, and the trial court held a hearing and made the necessary findings for admitting the child hearsay statements.[5]

¶ 25 At trial, Solis, who was qualified as an expert in child forensic interviewing, testified generally about how she conducts forensic interviews and said that she interviewed J.M. hours after the incident. During the forensic interview, presented in full to the jury, J.M. recounted the murders and identified Kartabrata as the murderer. J.M. told Solis that Kartabrata shot his father and mother and then went upstairs, where his sister and grandmother

---

[5] J.M.'s testimony fell within the child hearsay statute because he was the named victim of the felony menacing charge. § 13-25-129(1), C.R.S. 2025 (addressing testimony of a child witness who is alleged to have been the victim of the crime). Kartabrata does not challenge the applicability of the statute or the trial court's findings.

were; J.M. heard glass break; J.M.'s grandmother escaped; and J.M. ran to a nearby apartment, where he knocked on the door and asked someone to call 911.

¶ 26    The trial court did not provide the jury with a child hearsay cautionary instruction.

### B.    Standard of Review and Applicable Law

¶ 27    We review the trial court's decision to admit child hearsay under section 13-25-129 for an abuse of discretion. *People v. Phillips*, 2012 COA 176, ¶ 91.

¶ 28    Section 13-25-129(1) provides that "[a]n out-of-court statement made by a person under thirteen years of age, not otherwise admissible by a statute or court rule that provides an exception to the hearsay objection, is admissible in any criminal . . . proceeding in which the person is alleged to have been a victim."

¶ 29    Certain procedures must be followed when admitting such statements, including that the trial court give a cautionary jury instruction:

> If a statement is admitted pursuant to this section, the court shall instruct the jury in the final written instructions that during the proceeding the jury heard evidence repeating a child's out-of-court statement and that it is for

the jury to determine the weight and credit to be given the statement and that, in making the determination, the jury shall consider the age and maturity of the child, the nature of the statement, the circumstances under which the statement was made, and any other relevant factor.

§ 13-25-129(6).

¶ 30    Even if out-of-court statements satisfy the hearsay rules, though, a court may still exclude the testimony under CRE 403. That rule permits a court to exclude relevant evidence if its probative value is substantially outweighed by (1) "considerations of . . . needless presentation of cumulative evidence" or (2) "the danger of unfair prejudice." CRE 403. But "[t]he fact that evidence is cumulative does not, by itself, render the evidence inadmissible." *People v. Pahlavan*, 83 P.3d 1138, 1140 (Colo. App. 2003). Instead, admitting cumulative evidence amounts to an abuse of discretion only if the trial court's decision is arbitrary, unreasonable, or unfair. *Id.* And evidence is unfairly prejudicial if it suggests a decision based on the jury's bias, sympathy, anger, or shock. *People v. Gibbens*, 905 P.2d 604, 608 (Colo. 1995).

## C.    Kartabrata Has Not Demonstrated Plain Error

¶ 31    Kartabrata did not object to the admission of the forensic interview. Nor did he object to the trial court's omission of the cautionary instruction or request that the instruction be given. Thus, for us to reverse, any error must be both obvious and substantial. *Hagos v. People*, 2012 CO 63, ¶ 14. An error is obvious if the act or omission challenged on appeal contravenes a clear statutory command, a well-settled legal principle, or Colorado case law. *People v. Walker*, 2022 COA 15, ¶ 68. An error is substantial if it "so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Rail v. People*, 2019 CO 99, ¶ 46.

### 1.    Admission of the Forensic Interview

¶ 32    Kartabrata cites no statute, rule, or case clearly prohibiting the admission of the forensic interview under the circumstances here. And we are hard pressed to conclude — especially in the absence of any objection from the defense — that admitting the video was manifestly arbitrary, unreasonable, or unfair such that its admission was an abuse of the trial court's discretion.

14

¶ 33    Moreover, the entire substance of Kartabrata's argument is that the evidence was cumulative of J.M.'s trial testimony.[6]  But cumulative evidence rarely, if ever, rises to the level of prejudice necessary to constitute plain error.  *See People v. Joyce*, 68 P.3d 521, 524 (Colo. App. 2002) (concluding that admitting hearsay statements that were cumulative of trial testimony was not plain error).

### 2.    Failure to Give Cautionary Jury Instruction

¶ 34    As noted, the child hearsay statute requires the court to provide the jury with a cautionary instruction on the nature of child hearsay statements.  § 13-25-129(6).  Kartabrata contends, and we agree, that the trial court's omission was an obvious error.  *See People v. McClure*, 779 P.2d 864, 866 (Colo. 1989).[7]

---

[6] Although Kartabrata phrases his challenge in terms of irrelevance and improper bolstering, it is the cumulative nature of the evidence that underlies each of his arguments.

[7] We reject the People's post hoc effort to characterize the statements in the forensic interview as prior consistent statements offered to rebut an assertion of recent fabrication under CRE 801(d)(1).  The evidence was offered at trial under the child hearsay statute and, on this record, there are no grounds for admission of the statements under that rule.

15

¶ 35    But Kartabrata has not shown that the error was substantial. *See People v. Boykins*, 140 P.3d 87, 95 (Colo. App. 2005) ("In review for plain error, the defendant has the burden of persuasion with respect to prejudice.").

¶ 36    Indeed, he does not develop any argument as to how the lack of a cautionary instruction undermined the fundamental fairness of the trial. *See Hagos*, ¶ 14. He merely argues in conclusory fashion that "it cannot be said that the outcome of the trial was unaffected by the trial court's failure to provide this instruction." In support of this conclusory claim — which posits a level of prejudice far more akin to a harmless error analysis than a plain error inquiry — he again appears to rely solely on the cumulative nature of the testimony, citing only two brief statements in the prosecutor's closing argument where she noted that J.M.'s testimony on the stand was consistent with what he told Solis in the forensic interview.

¶ 37    Significantly, as the People point out — and Kartabrata makes no effort to rebut — there is overwhelming evidence of Kartabrata's guilt unrelated to J.M.'s forensic interview: a pistol found at Kartabrata's house that matched the description J.M. testified to at

trial; J.M.'s mother's blood on Kartabrata's pistol; gunshot residue on Kartabrata's hands and face; cartridge casings at the scene fired by the pistol; Kartabrata's ownership of silencers for his pistols (thus explaining why neighbors did not hear gunshots); testimony that the bullets fired did not match the barrel, suggesting that, after the shooting, Kartabrata switched the barrel on his pistol for one that could not accommodate a silencer; and evidence that Kartabrata was preparing to flee the country when he was arrested. Additionally, J.M. testified at trial and the court gave the standard credibility instruction to the jury.[8]

¶ 38    Because Kartabrata has not demonstrated that either the admission of the forensic interview or the omission of the cautionary instruction rose to plain error, we will not disturb the judgment on this ground.

---

[8] The only significant factor the statutory instruction directs the jury to consider that is not included in the general credibility instruction is the age and maturity of the child.

17

## IV. Identification in Video Footage

¶ 39 Kartabrata next contends that the trial court reversibly erred by admitting a detective's testimony identifying him in a video. We again discern no reversible error.

¶ 40 Videos from a neighbor's security camera taken the night of the incident were admitted at trial, showing people getting in and out of cars. Detective Jami Sisneros, the lead detective on the case, identified Kartabrata in one of the videos both before and immediately after the time of the murders. During cross-examination, she said she identified Kartabrata in the video on the basis of "the investigation [she] conducted in the case." She also testified that the video was black and white and taken "kinda far away" and said that "you can't definitively make out faces on that video." During closing statement, defense counsel argued,

> You heard Detective Sisneros watch this video and say that the person that she sees get out of the car is this man right here. But she's not the determiner of fact; you are. So you have to look at that video. And you have to look at its blurry graininess and make a determination that you can tell, not someone else, that you can tell who is the individual in that picture.

¶ 41    Under CRE 701, a lay witness may offer an opinion. And a lay witness may testify regarding the identity of a person depicted in a surveillance photograph or video if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph or video than the jury is. *See Robinson v. People*, 927 P.2d 381, 382 (Colo. 1996). But a lay witness's opinion based on exactly the same information that the jury has cannot be helpful to the jury. *People v. McFee*, 2016 COA 97, ¶ 76.

¶ 42    Because Kartabrata did not object to Detective Sisneros's testimony, we review for plain error. *Hagos*, ¶ 14.

¶ 43    Without deciding whether the trial court's admission of the testimony was error (or obvious error), we conclude that reversal is not warranted because the admission of this evidence, even if erroneous, does not "cast serious doubt on the reliability of the judgment of conviction." *McFee*, ¶ 71.

¶ 44    "Ordinarily, the risk of admitting improper lay opinion testimony of this type is that the jurors will assume that the witness is in a better position to interpret or understand the evidence than they are . . . ." *Id.* at ¶ 78.

¶ 45    But defense counsel was able to cross-examine Detective Sisneros regarding her identification, and Detective Sisneros admitted that Kartabrata's face was not discernible in the grainy surveillance footage.  *See People v. Vasquez*, 155 P.3d 588, 595 (Colo. App. 2006) (holding that admission of a police officer's testimony in which he identified a man in a photograph as the defendant was harmless where the defendant had the opportunity to cross-examine the officer on his testimony).  The jurors also watched the video and were given the general credibility instruction.  *See id.*; *McFee*, ¶ 79.  Further, defense counsel reminded the jurors in closing argument that they were the determiners of fact and needed to identify the individual in the surveillance footage themselves, irrespective of Detective Sisneros's identification.  Accordingly, even if it was improper for Detective Sisneros to identify Kartabrata in the footage, "the jury had no reason to accept [her] opinion and could evaluate [the footage] for itself."  *McFee*, ¶ 79.

¶ 46    Nor are we persuaded otherwise by Kartabrata's assertion that Detective Sisneros's interpretation of the surveillance footage amounted to an opinion that Kartabrata was guilty and committed

the offense, thereby invading the province of the jury. Although Detective Sisneros identified Kartabrata as the person in the surveillance video, she did not take the additional step of stating that, in her opinion, he committed the charged offenses. *See People v. Penn*, 2016 CO 32, ¶ 31; *Gallegos v. People*, 403 P.2d 864, 873 (Colo. 1965) ("[T]o say [the witness] identified the defendants does not give rise to the conclusion that they were, therefore, guilty of the crime charged."). Thus, any error does not warrant reversal.

## V. Disqualification of Prosecutor and District Attorney's Office

¶ 47 Finally, Kartabrata contends that the trial court erred by not disqualifying one of the prosecutors assigned to Kartabrata's case, as well as the entire Denver District Attorney's Office, from prosecuting it. We discern no error.

¶ 48 Before trial, the prosecution gave notice to the trial court and to defense counsel that one of the prosecutors assigned to the case lived on the block where the murders occurred, had met the victims at two neighborhood barbeques, had waved at them on the street, and had attended their funerals. But she had no other contact with the victims. The prosecutor had also never met Kartabrata and had no knowledge about him. An officer's body camera video showed

21

that, on the night of the murders, the prosecutor told a police officer that she had heard screaming but had seen nothing. The prosecutor was not on the prosecution's or defense's witness lists.[9] And her knowledge of the case came entirely from the discovery in the case.

¶ 49 The trial court denied Kartabrata's motion to disqualify the prosecutor and the district attorney's office. The court found that the prosecutor's knowledge of the facts of the case was minimal since all she heard was screaming and she did not know why or see anything, and she "had no contact or communication of any nature with" Kartabrata. Further, neither party intended to call the prosecutor or the officer who had the body camera footage of the prosecutor to testify. The court also found that, even if it found special circumstances justifying the disqualification of the prosecutor — which it did not — it would still not require disqualification of the entire district attorney's office.

---

[9] The People stated that the officer whose body camera footage showed the prosecutor at the scene of the incident that night was not going to be called as a witness at trial and that there was not any reason to believe that the body camera video was going to be introduced by either party.

¶ 50    We review a trial court's decision to disqualify a district attorney, or an entire office, for an abuse of discretion. *People v. Loper*, 241 P.3d 543, 546 (Colo. 2010); *People v. Chavez,* 139 P.3d 649, 654 (Colo. 2006).

¶ 51    Disqualification of a district attorney from a case is governed by section 20-1-107(2), C.R.S. 2025, which provides in relevant part that "[t]he motion [to disqualify] shall not be granted unless . . . special circumstances exist that would render it unlikely that the defendant would receive a fair trial." *See People v. Chavez,* 139 P.3d 649, 652 (Colo. 2006). The party moving to disqualify the district attorney based on "special circumstances" bears the burden of showing that, absent disqualification, they will not receive a fair trial. *Loper*, 241 P.3d at 546. "To meet this burden, the moving party must point to 'actual facts and evidence in the record supporting the contention.'" *People v. Kent*, 2020 CO 85, ¶ 19 (quoting *Loper*, 241 P.3d at 546).

¶ 52    To disqualify a district attorney's office based on special circumstances, the special circumstances "must be extreme," *People v. Solis*, 2022 CO 53, ¶ 26 (quoting *Kent*, ¶ 20), and only one set of facts has been determined to be sufficiently extreme to

potentially disqualify an entire district attorney's office. *See Chavez*, 139 P.3d at 654-55. In *Chavez*, the prosecutor's prior attorney-client relationship with the defendant and his access to confidential communications required that he be personally disqualified. *Id.* at 654. But instead of automatically imputing the conflict to the entire district attorney's office, the supreme court concluded that the analysis involved evaluating the efficacy of a district attorney office's screening policy, or lack thereof. *Id.* at 654-55.

¶ 53 Here, the trial court did not err by not disqualifying the prosecutor because the prosecutor barely knew the victims, did not know Kartabrata, was not an endorsed witness in the case, and did not independently know any of the underlying facts of the case.

¶ 54 Nor are we persuaded by Kartabrata's contention that the trial court erred because it did not consider all the facts and circumstances. Kartabrata contends that the trial court did not consider the seriousness of the charges, but the court noted that Kartabrata was charged with three counts of first degree murder, one count of felony menacing, and one count of third degree assault. Further, Kartabrata's contention that the prosecutor did

24

not remember that she was a possible witness is entirely speculative because Kartabrata has not shown any facts in the record indicating that the prosecutor actually was a potential witness. And though the court did not make findings with respect to the prosecutor's relationship with the victims or the fact that she attended their funerals, the court noted the prosecutor's peripheral involvement as a neighbor on that night and that she did not know Kartabrata.

¶ 55 Finally, there was no reason for the trial court to consider the district attorney's screening policy because the trial court properly declined to disqualify the prosecutor; therefore there was no conflict that could have been imputed to the entire office. Nor did Kartabrata ever contend that the prosecutor had "confidential information from a prior representation" that would need to be "adequately screened from others actually prosecuting the case." *Id.* at 655.

¶ 56 Thus, the trial court did not err by not disqualifying the prosecutor and the district attorney's office.

VI. Disposition

¶ 57 The judgment is affirmed.

JUDGE LUM and JUDGE MOULTRIE concur.